Fleet

SWAP AGREEMENT dated as of **June 12, 2002**, between Fleet National Bank ("Fleet") and **Atlantis Management LLC.**, (jointly and severally if there is more than one, "Counterparty").

WHEREAS, Counterparty (a) has entered into a term loan agreement dated as of **June 12, 2002** (the "Loan Agreement") with Fleet pursuant to which Counterparty has received or will receive a term loan (the "Loan") and (b) desires to enter into a swap transaction;

Accordingly, the parties agree as follows:

1. Inconsistency; Definitions. In the event of any inconsistency between the provisions of the Schedule to the Swap Agreement (the "Schedule") attached to this Agreement and the other provisions of this Agreement, the Schedule will prevail. As used in the Agreement:

"Calculation Period" means, with respect to any Payment Date, the period from, and including, the immediately preceding Payment Date and extending to, but excluding, such Payment Date.

"Counterparty Payment Amount" means, with respect to any Payment Date, an amount equal to the product of (a) the Counterparty Rate specified in the Schedule multiplied by (b) the Notional Amount specified in the Schedule for the immediately preceding Payment Date multiplied by (c) the actual number of days in the relevant Calculation Period divided by 360.

"Event of Default" means, with respect to a party, the occurrence at any time with respect to such party of any of the following events: (a) failure by the party to make, when due, any payment under this Agreement if such failure is not remedied on or before the third New York Banking Day after notice of such failure is given to the party, (b) failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement) to be complied with or performed by the party in accordance with this Agreement if such failure shall remain unremedied for ten days, (c) a representation made by the party in this Agreement proves to have been incorrect or misleading in any material respect when made, (d) the party (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or

Fleet

"Payment Date" means each date specified as such in the Schedule or, if such day is not a New York Banking Day, the first following day that is a New York Banking Day.

"Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money, as well as reimbursement obligations in respect of letters of credit, financial guaranty insurance or surety bonds issued for the account of that person and trade debt incurred other than through borrowings.

2. Payments under Swap; Adjustment of Loan Terms.

(a) Payment Obligations. Subject to Sections 2(c) and 2(d), on each Payment Date (other than the date hereof), (i) if the Fleet Payment Amount exceeds the Counterparty Payment Amount, Fleet shall pay to Counterparty the excess of the Fleet Payment Amount over the Counterparty Payment Amount and (ii) if the Counterparty Payment Amount exceeds the Fleet Payment Amount, Counterparty shall pay to Fleet the excess of the Counterparty Payment Amount over the Fleet Payment Amount.

(b) Adjustment of Loan Terms. Counterparty shall not prepay the Loan in part without prior written notice to Fleet. Subject to Sections 2(c) and 2(d), if Counterparty elects to prepay the Loan in whole or in part, (i) Counterparty shall notify Fleet of the amount and date of prepayment on or prior to such date, (ii) Fleet shall revise the notional principal table contained in the Schedule to reflect the revised amortization schedule for the Loan and shall send Counterparty a copy of the revised notional principal table, (iii) Fleet shall calculate in good faith and in a commercially reasonable manner the aggregate termination amount required to be paid by one party to the other party as a result of the change in the notional principal table (including, without limitation, the Fleet Payment Amount and Counterparty Payment Amount that would have been payable in respect of the reduction in the Notional Amount for the period from the Payment Date immediately preceding Counterparty's prepayment through the date of prepayment) and (iv) Fleet or Counterparty, as the case may be, shall pay to the other party such amount by the second New York Banking Day following Fleet's effective notice to Counterparty of such amount.

(c) Conditions Precedent. Each payment obligation of each party under Sections 2(a) and 2(b) is subject to the condition precedent that (i) no Event of Default or event which, with the giving of notice or lapse of time or both, would constitute an Event of Default with respect to the other party has occurred and is continuing and (ii) no Early Termination Date has been designated.

(d) Debit Authorization. If Debit Authorization is specified in the Schedule as applicable, Counterparty irrevocably authorizes Fleet to debit any of the Counterparty's business accounts maintained with Fleet for all amounts payable by Counterparty from time to time in connection with this Agreement. This Debit Authorization shall not obligate Fleet to create or allow any overdraft, and such Debit Authorization shall not relieve Counterparty of the obligation to assure that payments are made when due. If Debit Authorization is specified in the Schedule as inapplicable, Counterparty shall pay Fleet in freely transferable funds to the account

Fleet

designated by Fleet in the Schedule or otherwise. If Fleet owes an amount to Counterparty, Counterparty hereby authorizes Fleet, in its discretion, either to apply such amount to the Loan or to credit such amount to the account designated by Counterparty in the Schedule or otherwise.

(e) Default Interest. Prior to the designation of an Early Termination Date, a party that defaults in the performance of any payment obligation will, to the extent permitted by law, be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Counterparty Rate plus five percent per annum. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

3. Consequences of an Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days' notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date. Upon the designation of an Early Termination Date, no further payments under Section 2 above will be required to be made and Fleet shall calculate in good faith and in a commercially reasonable manner the net termination amount required to be paid by the Defaulting Party or the Non-defaulting Party, as the case may be, to the other party as the result of the early termination of this Agreement, which amount shall be payable, subject to Section 5(c) below, on the day that Fleet's notice to Counterparty of the amount payable is effective. Such amount shall be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the Early Termination Date to (but excluding) the date such amount is paid, at a rate per annum equal to the Fleet Rate (in the case of an amount owed by the Non-defaulting Party) or twenty percent (in the case of an amount owed by the Defaulting Party). Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including, but not limited to, legal fees (which may include costs allocated by Fleet's internal counsel) and disbursements, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or by reason of the early termination of this Agreement, including, but not limited to, costs of collection.

4. Representations and Covenants.

(a) Counterparty makes the following representations: (i) it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing; (ii) it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance; (iii) such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of

Fleet

government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; (iv) all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with; (v) its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law); and (vi) all information that is furnished in writing to Fleet by or on behalf of Counterparty is, as of the date of the information, true, accurate and complete in every material respect.

(b) If Eligible Contract Participant is specified in the Schedule as applicable, each party represents and warrants to the other party that it is either (i) a depository institution (as defined in Section 3 of the Federal Deposit Insurance Act) or (ii) a corporation, partnership, proprietorship, organization, trust, or other entity (A) that has total assets exceeding $10,000,000, (B) the obligations of which under this Agreement are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by a bank or by an entity referred to in clause (i) or (ii)(A) above, or (C) that has a net worth of $1,000,000 and is entering into this Agreement (x) in connection with the conduct of its business or (y) to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by it in the conduct of its business. If Eligible Contract Participant is specified in the Schedule as inapplicable, each party (i) represents and warrants to the other party that it has entered into this Agreement in conjunction with its line of business (including financial intermediation services) or the financing of its business and (ii) acknowledges and agrees that (A) this Agreement is terminable, absent default, only with the consent of the other party or upon and to the extent of prepayment of the Loan, (B) this Agreement constitutes a swap agreement and is not one of a fungible class of agreements that are standardized as to their material economic terms, (C) the material terms of this Agreement and the Loan Agreement have been subject to individual negotiation by the parties, and (D) the creditworthiness of the other party was a material consideration in entering into or determining the terms of this Agreement, including pricing, cost or credit enhancement terms of this Agreement.

(c) Counterparty represents that (i) it is acting for its own account, (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands, accepts and has made its own independent decisions with respect to (based on its own judgment and upon advice from such advisors as it has deemed necessary), the terms, conditions, risks and appropriateness of this Agreement, (iii) it is not relying on any communications of Fleet or its affiliates as investment advice or as a recommendation to enter into this Agreement, and (iv) Fleet and its affiliates are not acting as a fiduciary for or an advisor to it in respect of this Agreement.

(d) Counterparty agrees to complete, accurately and in a manner reasonably satisfactory to Fleet, execute and deliver to Fleet a United States Internal Revenue Service Form W-9, or any successor form, (i) upon execution of this Agreement; (ii) promptly upon reasonable

demand by Fleet; and (iii) promptly upon learning that any Form W-9 (or any successor thereto) previously provided by Counterparty has become obsolete or incorrect.

(e) Counterparty agrees to deliver to Fleet upon execution of this Agreement (i) a certificate of an authorized officer for Counterparty and any guarantor of Counterparty's obligations hereunder certifying the authority, names and true signatures of the officers signing this Agreement and any related guarantee, reasonably satisfactory in form and substance to Fleet, (ii) certified copies of documents evidencing each action taken by Counterparty and such guarantor to authorize its execution of this Agreement or such guarantee, as the case may be, and the performance of its obligations hereunder or under such guarantee, as the case may be, and (iii) certified copies of its bylaws and articles of incorporation or other constituent documents.

5. Miscellaneous.

(a) Fleet shall calculate the amounts required to be calculated hereunder and Fleet's determinations and calculations shall be binding in the absence of manifest error. If any interest rate determined in accordance with the terms of this Agreement exceeds the maximum rate of interest allowed by applicable law (the "Maximum Allowable Rate"), that rate shall be such Maximum Allowable Rate. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto. This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(b) No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties. Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that Fleet may transfer its rights and obligations hereunder, in whole but not in part, to any of its affiliates. Any purported transfer in violation of this Section 5(b) shall be null and void.

(c) If, but for this sentence, Fleet would be obligated to pay an amount pursuant to Section 3 above at a time when any amount is payable (whether at such time or in the future or upon the occurrence of any contingency) by Counterparty to Fleet or its affiliates under any other agreement between them including, but not limited to, any transaction which is a rate swap transaction or forward rate swap transaction, or any instrument or undertaking of Counterparty (each such amount, an "Other Obligation"), Fleet is hereby authorized by Counterparty to set off the obligation hereunder against any Other Obligation without prior notice. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege. The rights, powers, remedies and privileges

Fleet

provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(d) This Agreement will be governed by and construed in accordance with the laws of the State of New York (without giving effect to choice of law doctrine).

(e) In the event that any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which is held invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

(f) **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDINGS. AS TO ANY MATTER FOR WHICH A JURY TRIAL CANNOT BE WAIVED, EACH PARTY AGREES NOT TO ASSERT ANY SUCH MATTER AS A CROSS CLAIM OR COUNTERCLAIM IN, NOR MOVE TO CONSOLIDATE THE SAME WITH, ANY LEGAL PROCEEDING IN WHICH A JURY TRIAL IS WAIVED.**

(g) Each party consents to the monitoring or recording, at any time and from time to time, by the other party of any and all communications between officers or employees of the parties, waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording.

(h) Any notice or other communication in respect of this Agreement may be given in any manner identified in this Section 5(h) (except that a notice or other communication under Section 3 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided below and will be deemed effective as indicated: (i) if in writing and delivered in person or by courier, on the date it is delivered; (ii) if sent by telex, on the date the recipient's answerback is received; (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); (iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or (v) if sent by electronic messaging system, on the date that electronic message is received, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a New York Banking Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a New York Banking Day, in which case that communication shall be deemed given and effective on the first following day that is a New York Banking Day. Either party may by notice to the other change the address, telex or facsimile number or electronic message system details at which notices or other communications are to be given to it.

Fleet

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document

**FLEET NATIONAL BANK**

By: ______________________
Name:
Title:

By: ______________________
Name:
Title:

**ATLANTIS MANAGEMENT LLC**

By: ______________________
Name: TAREK WEHBE
Title: Member

Information for Notices:

Address:
Fleet National Bank
100 Federal Street MA DE 10013H
Global FX & Interest Rate Derivatives
Boston, Massachusetts 02110

Attention:
Documentation Unit

Telephone No: (617) 434-8103
Facsimile No: (617) 434-3588/4284
Telex: 144203 (Answerback: FLEETB1)

Information for Notices:

Address:

Attention:
Edgar Wehbe

Telephone No: 401-339-1827
Facsimile No:

**Trade ID # 73876FB**

Fleet

Schedule to the Swap Agreement
dated as of June 12, 2002
between Fleet National Bank and Atlantis Management LLC

| | |
|---|---|
| Counterparty Rate: | 6.99000% percent per annum |
| Fleet Rate: | LIBOR |
| Spread: | 135.000 basis points |
| Designated Maturity: | One month |
| Debit Authorization: | Applicable |
| Eligible Contract Participant: | Inapplicable |
| Instructions for payments to Fleet: | 9418115463 |
| Instructions for payments to Counterparty: | 9418115463 |

Revised Notional Principal Table, See Attached

**Trade ID# 73876FB**

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 06/12/2002 | 476,000.00 |
| 07/12/2002 | 475,066.42 |
| 08/12/2002 | 474,132.84 |
| 09/12/2002 | 473,199.26 |
| 10/15/2002 | 472,265.68 |
| 11/12/2002 | 471,332.10 |
| 12/12/2002 | 470,398.52 |
| 01/13/2003 | 469,464.94 |
| 02/12/2003 | 468,531.36 |
| 03/12/2003 | 467,597.78 |
| 04/14/2003 | 466,664.20 |
| 05/12/2003 | 465,730.62 |
| 06/12/2003 | 464,797.04 |
| 07/14/2003 | 463,817.21 |
| 08/12/2003 | 462,837.38 |
| 09/12/2003 | 461,857.55 |
| 10/14/2003 | 460,877.72 |
| 11/12/2003 | 459,897.89 |
| 12/12/2003 | 458,918.06 |
| 01/12/2004 | 457,938.23 |
| 02/12/2004 | 456,958.40 |
| 03/12/2004 | 455,978.57 |
| 04/12/2004 | 454,998.74 |
| 05/12/2004 | 454,018.91 |
| 06/14/2004 | 453,039.08 |
| 07/12/2004 | 451,956.96 |
| 08/12/2004 | 450,874.84 |
| 09/13/2004 | 449,792.72 |
| 10/12/2004 | 448,710.60 |
| 11/12/2004 | 447,628.48 |
| 12/13/2004 | 446,546.36 |
| 01/12/2005 | 445,464.24 |
| 02/14/2005 | 444,382.12 |
| 03/14/2005 | 443,300.00 |
| 04/12/2005 | 442,217.88 |
| 05/12/2005 | 441,135.76 |
| 06/13/2005 | 440,053.64 |
| 07/12/2005 | 438,893.07 |
| 08/12/2005 | 437,732.50 |
| 09/12/2005 | 436,571.93 |
| 10/12/2005 | 435,411.36 |
| 11/14/2005 | 434,250.79 |
| 12/12/2005 | 433,090.22 |
| 01/12/2006 | 431,929.65 |
| 02/13/2006 | 430,769.08 |
| 03/13/2006 | 429,608.51 |

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 04/12/2006 | 428,447.94 |
| 05/12/2006 | 427,287.37 |
| 06/12/2006 | 426,126.80 |
| 07/12/2006 | 424,888.91 |
| 08/14/2006 | 423,651.02 |
| 09/12/2006 | 422,413.13 |
| 10/12/2006 | 421,175.24 |
| 11/13/2006 | 419,937.35 |
| 12/12/2006 | 418,699.46 |
| 01/12/2007 | 417,461.57 |
| 02/12/2007 | 416,223.68 |
| 03/12/2007 | 414,985.79 |
| 04/12/2007 | 413,747.90 |
| 05/14/2007 | 412,510.01 |
| 06/12/2007 | 411,272.12 |
| 07/12/2007 | 409,950.20 |
| 08/13/2007 | 408,628.28 |
| 09/12/2007 | 407,306.36 |
| 10/12/2007 | 405,984.44 |
| 11/13/2007 | 404,662.52 |
| 12/12/2007 | 403,340.60 |
| 01/14/2008 | 402,018.68 |
| 02/12/2008 | 400,696.76 |
| 03/12/2008 | 399,374.84 |
| 04/14/2008 | 398,052.92 |
| 05/12/2008 | 396,731.00 |
| 06/12/2008 | 395,409.08 |
| 07/14/2008 | 393,983.72 |
| 08/12/2008 | 392,558.36 |
| 09/12/2008 | 391,133.00 |
| 10/14/2008 | 389,707.64 |
| 11/12/2008 | 388,282.28 |
| 12/12/2008 | 386,856.92 |
| 01/12/2009 | 385,431.56 |
| 02/12/2009 | 384,006.20 |
| 03/12/2009 | 382,580.84 |
| 04/13/2009 | 381,155.48 |
| 05/12/2009 | 379,730.12 |
| 06/12/2009 | 378,304.76 |
| 07/13/2009 | 376,786.79 |
| 08/12/2009 | 375,268.82 |
| 09/14/2009 | 373,750.85 |
| 10/13/2009 | 372,232.88 |
| 11/12/2009 | 370,714.91 |
| 12/14/2009 | 369,196.94 |
| 01/12/2010 | 367,678.97 |

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 02/12/2010 | 366,161.00 |
| 03/12/2010 | 364,643.03 |
| 04/12/2010 | 363,125.06 |
| 05/12/2010 | 361,607.09 |
| 06/14/2010 | 360,089.12 |
| 07/12/2010 | 358,441.47 |
| 08/12/2010 | 356,793.82 |
| 09/13/2010 | 355,146.17 |
| 10/12/2010 | 353,498.52 |
| 11/12/2010 | 351,850.87 |
| 12/13/2010 | 350,203.22 |
| 01/12/2011 | 348,555.57 |
| 02/14/2011 | 346,907.92 |
| 03/14/2011 | 345,260.27 |
| 04/12/2011 | 343,612.62 |
| 05/12/2011 | 341,964.97 |
| 06/13/2011 | 340,317.32 |
| 07/12/2011 | 338,555.36 |
| 08/12/2011 | 336,793.40 |
| 09/12/2011 | 335,031.44 |
| 10/12/2011 | 333,269.48 |
| 11/14/2011 | 331,507.52 |
| 12/12/2011 | 329,745.56 |
| 01/12/2012 | 327,983.60 |
| 02/13/2012 | 326,221.64 |
| 03/12/2012 | 324,459.68 |
| 04/12/2012 | 322,697.72 |
| 05/14/2012 | 320,935.76 |
| 06/12/2012 | |