01- 0001385673- (,34)

Fleet

Small Business Services

## TERM LOAN PROMISSORY NOTE

**$476,000.00 Maximum Principal Amount**

Date: June 12, 2002

**BORROWER:** ATLANTIS MANAGEMENT, LLC

**BANK:** Fleet National Bank

**BANK'S ADDRESS:** 111 Westminster Street, Providence, Rhode Island 02903

**INTEREST RATE:** The interest rate per annum equal to One point Thr Five percent ( 1.35 %) above the LIBOR Rate (as defined in section 2.)

**PAYMENT SCHEDULE:** This Note shall be due and payable in ONE HUNDRED TWENTY (120) principal installments commencing on July 12, 2002, and continuing on the same day of each successive month until payment in full, plus monthly payments of interest in arrears. Principal payments shall be in the following amounts: payments 1-12 each in the amount of Nine Hundred Thirty Three and 58/100 Dollars ($933.58); payments 13-24 each in the amount of Nine Hundred Seventy Nine and 83/100 Dollars ($979.83); payments 25-36 each in the amount of One Thousand Eighty Two and 12/100 Dollars ($1,082.12); payments 37-48 each in the amount of One Thousand One Hundred Sixty and 57/100 Dollars ($1,160.57); payments 49-60 each in the amount of One Thousand Two Hundred Thirty Seven and 89/100 Dollars ($1,237.89); payments 61-72 each in the amount of One Thousand Three Hundred Twenty One and 92/100 Dollars ($1,321.92); payments 73-84 each in the amount of One Thousand Four Hundred Twenty Five and 36/100 Dollars ($1,425.36); payments 85-96 each in the amount of One Thousand Five Hundred Seventeen and 97/100 Dollars ($1,517.97); payments 97-108 each in the amount of One Thousand Six Hundred Forty Seven and 65/100 Dollars ($1,647.65); and payments 109-120 each in the amount of One Thousand Seven Hundred Sixty One and 96/100 Dollars ($1,761.96).

**LOAN AGREEMENT:** That certain Term Loan Agreement of even date between the Bank and the Borrower relating to the indebtedness evidenced hereby, the terms and provisions of which are incorporated herein by reference.

All capitalized words or phrases which are not otherwise specifically defined hereinabove or elsewhere in this Note shall have the meaning assigned in the Loan Agreement.

1. **Promise to Pay.** FOR VALUE RECEIVED, the Borrower (jointly and severally if more than one) promises to pay to the order of the Bank, the Principal Amount; together with interest in accordance with the Payment Schedule and at the Interest Rate on the unpaid principal balance hereof from time to time outstanding. Notwithstanding the foregoing, from and after maturity (including any accelerated maturity), all principal and other amounts outstanding and payable under this Note shall bear interest at the rate of twenty percent (20%) per annum until paid in full. If not sooner paid, the entire remaining balance of this Note (principal, interest, and any other fees and charges then due) shall be due and payable in full on June 12, 2012.
2. **LIBOR Rate.** Each reference in this Note to "LIBOR Rate" shall mean, as applicable to any Interest Period, the rate per annum as determined on the basis of the offered rate for deposits in U.S. dollars, for a period of time comparable to such Interest Period, which appears on Telerate page 3750 as of 11:00 a.m. London time on the day that is two (2) London Banking Days preceding the first day of such Interest Period; provided however, if the rate described above does not appear on the Telerate System on any applicable interest determination date, then the LIBOR Rate shall be the rate offered for deposits in U.S. Dollars in the London interbank market for a period substantially equal to the Interest Period, determined by the Bank in a commercially reasonable manner. "Banking Day" means, in respect of any city, any date on which commercial banks are open for business in that city. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits of the Bank then for any period during which such Reserve Percentage shall apply, the LIBOR Rate shall be equal to the amount determined above divided by an amount equal to one (1) minus the Reserve Percentage. "Reserve Percentage" shall mean the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Euro-currency Liabilities" as defined in Regulation D. "Interest Period" means, initially, the period commencing on the date hereof and ending on the day immediately preceding the first payment date

identified in the Payment Schedule, and thereafter, the period from and including the immediately preceding payment date to but excluding the following payment date.

3. **Payment Provisions.** All payments shall be made by the Borrower to the Bank at Bank's Address, or such other place as the Bank may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments. If this Note or any payment hereunder becomes due on a day which is not a Business Day (as defined below), the due date of this Note or payment shall be extended to the next succeeding Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment. As used herein, "Business Day" shall mean any day other than a Saturday, Sunday or day which shall be in the (State of Rhode Island) a legal holiday or day on which banking institutions are required or authorized to close. All payments shall be applied first to the payment of all fees, expenses and other amounts due to the Bank (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after DEMAND or an Event of Default, payments will be applied to the obligations of the Borrower to the Bank as the Bank determines in its sole discretion.
4. **Incorporation of Loan Agreement; Prepayment; Etc.** This Note is the Note referred to in, and is entitled to the benefits of, the Loan Agreement which, among other things, contains provisions (i) for the acceleration of the maturity hereof upon the happening of certain stated events (individually and collectively in the Loan Agreement and in this Note, an "Event of Default"), (ii) for the election by the Borrower of a Fixed Rate if the initial Interest Rate on this Note is a Variable Rate, and also (iii) for prepayment on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.
5. **Late Fee.** If the entire amount of any required principal and/or interest is not paid in full within (10) days after the same is due, the Borrower shall pay to the Bank a late fee equal to five percent (5%) of the required payment.
6. **Fees and Expenses.** The Borrower will pay all expenses incurred by the Holder in connection with the preparation of the Loan Documents, the making of the loan evidenced by this Note, and the enforcement of the rights of the Holder in connection with this Note and the Loan Documents, including, but not limited to, the reasonable fees of its counsel (which may include costs allocated by the Holder's internal legal department), plus the disbursements of said counsel. The Borrower further agrees to pay to the Holder on demand all reasonable fees, costs and expenses incurred by the Holder in connection with the administration of this Loan, including, without limitation, overnight courier fees, lien search fees, filing and recording fees, and other fees and charges as provided in the Loan Agreement.
7. **Pledge to Federal Reserve.** The Bank may at any time pledge or assign all or any portion of its rights under the loan documents (including any portion of the promissory note) to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release the Bank from its obligations under any of the loan documents.
8. **Right of Setoff.** The Borrower hereby grants to the Bank, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to the Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any entity under the control of FleetBoston Financial Corporation and its successors and assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by the Borrower), the Bank may setoff the same or any part thereof and apply the same to any liability or obligation of the Borrower and any guarantor even though unmatured and regardless of the adequacy of any other collateral securing the Loan. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.
9. **Replacement of Note.** Upon receipt of an affidavit of an officer of the Bank as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or other security document, the Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.
10. **Waiver.** The Borrower expressly waives presentment, notice of dishonor, protest and notice of non-payment.
11. **Joint and Several Obligations.** If this Note is signed by more than one Borrower, all obligations of the Borrower are their joint and several obligations.
12. **Choice of Law.** This Note and the rights and obligations of the parties hereunder shall be construed and interpreted in accordance with the laws of the State of Rhode Island (the "Governing State") (excluding the laws applicable to conflicts or choice of law).
13. **Waiver of Trial by Jury. THE BORROWER AND THE BANK (BY ACCEPTANCE OF THIS NOTE) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE BANK RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL,**

EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF THE BANK HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE BANK TO ACCEPT THIS NOTE AND MAKE THE LOAN.

WITNESS:

Marc A. Soucy
Witness

ATLANTIS MANAGEMENT, LLC

By: ______________________
Name: Tarek W. Wehbe
Title: Authorized Member

Fleet
Small Business Services

TERM LOAN AGREEMENT

ATLANTIS MANAGEMENT, LLC of 790 North Main Street, Providence, RI 02904 (jointly and severally if more than one, the "Borrower") and Fleet National Bank, a national banking association created and existing under the laws of the United States of America with its principal office located at 111 Westminster Street, Providence, RI 02903 (the "Bank"), for valuable consideration, the receipt of which is hereby acknowledged, agree as follows:

I. DEFINITIONS.

1. Each reference herein to:

a. **"Accounts", "Chattel Paper", "Consumer Goods", "Documents", "Equipment", "Farm Products", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Money", and "Securities"** shall have the meaning assigned to each in the Uniform Commercial Code from time to time in effect in the State (the "UCC");

b. **"Appraisal"** shall mean one or more written statements pertaining to the Premises and/or the improvements thereon which (i) are independently and impartially prepared by a licensed or certified appraiser, (ii) set forth an opinion of defined value as of a specific date, (iii) are supported by presentation and analysis of relevant market information, and (iv) satisfy all Federal and State regulatory requirements of the Bank;

c. **"Affiliates of Borrower"** means any person or entity that, directly or indirectly, controls, is controlled by or is under common control with the Borrower or is an inside director or officer of the Borrower. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to vote five percent (5%) or more of (i) the voting stock of a corporation, (ii) the partnership interests of a partnership, or (iii) the membership interests of a limited liability company, or to direct or cause the direction of the management and policies of any such entity, whether through the ownership of voting stock, partnership interests, membership interests, by contract or otherwise;

d. **"Books and Records"** shall mean all books, correspondence, credit files, records and other documents relating directly or indirectly to the Obligations and the Collateral, including, without limitation, all tapes, cards, runs, data bases, software programs, diskettes, and other papers and documents in the possession or control of the Borrower, any computer service bureau, or other agent or independent contractor:

e. **"Hazardous Substances"** shall mean any "chemical liquids," "hazardous material," "hazardous waste," "hazardous substances," "oil," "petroleum products," or "solid, liquid or gaseous products," as defined or referred to in or contemplated by any applicable federal, State or local environmental law, statute, rule or regulation, and shall also include, without limitation, whether or not included in the definition contained in any such law, statute, rule or regulation, asbestos and other substances or materials which may pose a present or potential hazard to human health or the environment;

f. **"Loan Documents"** shall mean this Agreement, the Note, any Bank issued Commitment Letter and any amendments thereto, and any and all mortgages, pledge agreements, security agreements, financing statements, guaranties and other documents related to this Agreement and/or the Loan;

g. **"Material Adverse Change"** shall mean with respect to the Borrower and any guarantors and any of their respective properties or revenues, an event, action or condition that would or is reasonably likely to (i) adversely affect the validity or enforceability of, or the authority of the Borrower and/or any guarantor to perform their respective obligations under, the Loan Documents, or (ii) materially adversely affect the business, operations, assets or condition (financial or otherwise) of the Borrower and/or any guarantor or the ability of the Borrower and/or any guarantor to perform their respective obligations under any of the Loan Documents, or (iii) materially adversely affect the value of any Collateral;

h. **"Premises"** shall mean the real estate owned by the Borrower, or to be acquired by the Borrower with a portion of the Loan proceeds, and more fully described on affixed Exhibit A-4;

i. **"Rate"** "LIBOR Rate" shall mean, as applicable to any Interest Period, the rate per annum as determined on the basis of the offered rate for deposits in U.S. dollars, for a period of time comparable to such Interest Period, which appears on Telerate page 3750 as of 11:00 a.m. London time on the day that is two (2) London Banking Days preceding the first day of such Interest Period; provided however, if the rate described above does not appear on the Telerate System on any applicable interest determination date, then the LIBOR Rate shall be the rate offered for deposits in U.S. Dollars in the London interbank market for a period substantially equal to the Interest Period, determined by the Bank in a commercially reasonable manner. "Banking Day" means, in respect of any city, any date on which commercial banks are open for business in that city. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits of the Bank then for any period during which such Reserve Percentage shall

apply, the LIBOR Rate shall be equal to the amount determined above divided by an amount equal to one (1) minus the Reserve Percentage. "Reserve Percentage" shall mean the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Euro-currency Liabilities" as defined in Regulation D. "Interest Period" means, initially, the period commencing on the date hereof and ending on the day immediately preceding the first payment date identified in the Payment Schedule in the Note, and thereafter, the period from and including the immediately preceding payment date to but excluding the following payment date;

j. **"State"** shall mean the State of Rhode Island.

k. **"Title Insurance Policy"** shall mean refer to a mortgagee's title insurance policy in an amount equal to the maximum principal amount of the Loan issued by a title insurance company licensed to do business in the State and acceptable to the Bank, such policy to be in the form of the American Land Title Association's standard form of mortgagee title insurance policy (or in such other form as may be required by statute); said policy to show no prior liens or encumbrances except such as may be expressly approved in writing by the Bank; to contain no exceptions, (including so-called standard exceptions which must be deleted); to insure against mechanics' and materialmen's liens; and to be in all respects satisfactory to the Bank.

## II. LOAN.

1. **Term Loan; Purposes.** The Bank agrees on the terms and provisions of this Agreement to extend a term loan for the account of the Borrower in the principal sum of Four Hundred Seventy-Six Thousand and No/100 Dollars ($476,000.00) (the "Loan") for the following purpose(s): Purchase of Owner Occupied Real Estate

2. **Note; Interest Calculation.** The Loan shall be evidenced by the Borrower's note of even date with this Agreement (which note and all amendments thereto and any additional or supplementary notes executed pursuant to this Agreement are herein referred to collectively as the "Note"). The interest rate initially set forth in the Note is a variable rate. From and after maturity (including any accelerated maturity), the interest rate on the Note shall increase to twenty percent (20%) per annum. Interest shall be calculated on the basis of a 360-day year using the actual number of days elapsed. On maturity, whether scheduled or otherwise, both principal and all accrued and unpaid interest shall be immediately due and payable.

3. **Late Fee.** If the entire amount of any required principal and/or interest is not paid in full within (10) days after the same is due, the Borrower shall pay to the Bank a late fee equal to five percent (5%) of the required payment.

4. **Prepayment.** Borrower may prepay the Loan only upon at least three (3) Banking Days prior written notice to Bank (which notice shall be irrevocable), and any such prepayment shall occur only on the last day of the Interest Period for the Loan. Borrower shall pay to Bank, upon request of Bank, such amount or amounts as shall be sufficient (in the reasonable opinion of Bank) to compensate it for any loss, cost or expense incurred as a result of (i) any payment of the Loan on a date other than the last day of the Interest Period for such Loan and (ii) any failure by Borrower to pay the Loan on the date for payment specified in Borrower's written notice. Without limiting the foregoing, Borrower shall pay to Bank a "yield maintenance fee" in an amount computed as follows: The current rate for United States Treasury securities (bills on a discounted basis shall be converted to a bond equivalent) with a maturity date closest to the term chosen pursuant to the Fixed Rate Election as to which the prepayment is made, shall be subtracted from the LIBOR in effect at the time of prepayment. If the result is zero or a negative number, there shall be no yield maintenance fee. If the result is a positive number, then the resulting percentage shall be multiplied by the amount of the principal balance being prepaid. The resulting amount shall be divided by 360 and multiplied by the number of days remaining in the term chosen pursuant to the Fixed Rate Election as to which the prepayment is made. Said amount shall be reduced to present value calculated by using the above referenced Unites States Treasury securities rate and the number of days remaining in the term chosen pursuant to the Fixed Rate Election as to which prepayment is made. The resulting amount shall be the yield maintenance fee due to Bank upon the payment of the Loan. Each reference in this paragraph to "Fixed Rate Election" shall mean the election by Borrower of the LIBOR Rate. If by reason of an Event of Default, Bank elects to declare the Note to be immediately due and payable, then any yield maintenance fee with respect to the Loan shall become due and payable in the same manner as though the Borrower had exercised such right of prepayment.

5. **Loan Origination Fee.** A nonrefundable loan origination fee of ~~$1,500.00~~ will be due and payable at closing.

~~6,770.00~~ $6,689.60 D.A. D.A.

## III. REPRESENTATIONS AND WARRANTIES.

The Borrower represents and warrants that:

1. **Organization and Powers.** (a) If a corporate, partnership, limited liability company or trust Borrower, it is duly organized, validly existing and in good standing under the laws of the state of its formation and in every other jurisdiction, except where the failure to so qualify would not have a material adverse effect upon the Borrower, its property, its financial condition, or otherwise, (b) it has the power and authority to own its properties and to carry on its business as now being conducted and, if a corporate, partnership, limited liability company or trust Borrower, is qualified to do business in every jurisdiction where such qualification is necessary, (c) it has the power to execute, deliver and perform the Loan Documents, (d) the execution, delivery and performance of the Loan Documents have been duly authorized by all requisite action, (e) the execution, delivery and performance of the Loan Documents will not violate any provision of law, any order of any court or other agency of

government, the Articles of Incorporation or By-laws of a corporate Borrower, the partnership agreement of a partnership Borrower, the Articles of Incorporation or Operating Agreement of a limited liability company Borrower, or the trust agreement of a trust Borrower, or any indenture, agreement or other instrument to which it is a party, or by which it is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of the Borrower (other than in favor of the Bank) or the acceleration of any of its outstanding indebtedness.

2. **Financial Statements.** The Borrower has heretofore furnished to the Bank accurate and complete financial data and other information based on its operations in previous years, and said financial data fairly presents the financial position and the results of operations for the periods indicated therein. There has been no Material Adverse Change since the date of the most recent financial statement.

3. **Litigation.** There is no action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or threatened against or affecting the Borrower.

4. **No Conflict.** The Borrower is not a party to any agreement or instrument or subject to any restriction materially or adversely affecting its business, properties or assets, operations or condition, financial or otherwise. The Borrower has no knowledge that it is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party.

5. **Use of Proceeds.** No part of the proceeds of the Loan will be used for consumer purposes or will be used, in whole or in part, to purchase or carry, directly or indirectly, any margin stock or margin security (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) or to extend credit to others for the purpose of purchasing or carrying any such margin stock or margin security. If requested by the Bank, the Borrower will furnish in connection with this Agreement a statement in conformity with the requirements of Federal Reserve Form U-1 referred to in said Regulation U.

6. **Hazardous Substances.** There has never been a release, the generation, storage (except in full compliance with all applicable environmental laws), or disposal of any Hazardous Substances on the Premises in violation of any applicable environmental laws; Borrower is not aware of the existence (except in full compliance with all applicable environmental laws), release or threat of release of any Hazardous Substances on or from the Premises, nor does the Borrower have actual knowledge of the existence (except in full compliance with all applicable environmental laws), release or threat of release of any Hazardous Substances on or from any property adjacent to or surrounding the Borrower's Premises; neither the Borrower nor the lessor in the instance of a ground lease has received any notice, order, claim or demand from the U.S. Environmental Protection Agency or any state or local governmental agency, authority or body having jurisdiction over Hazardous Substances or the storage or removal thereof with respect to the existence, release or threat of release of any Hazardous Substances.

## IV. CONDITIONS OF LENDING.

1. The Bank shall be obligated to extend the credit and make the advances under this Agreement only if on the date such advance is requested:

   a. The Bank shall have received, to the extent applicable (i) copies of the Articles of Incorporation, Certificate of Incorporation, Certificate of Limited Partnership, or Certificate of a Limited Liability Company or Partnership, each certified by the secretary of state of the state of its formation, (ii) copies of partnership, trust, or operating agreements, each certified to the Bank by a duly authorized representative of such Borrower, (iii) Good Standing, Subsistence and/or Existence Certificates of the state of formation of the Borrower and from all other states where such Borrower conducts its business or holds property, (iv) duly adopted resolutions authorizing the execution, delivery and performance under the Loan Documents certified by an officer of the Borrower;
   b. The representations and warranties in Part III hereof are true and correct;
   c. No Event of Default shall have occurred;
   d. If all or a portion of the proceeds of the Loan are to be used to refinance or acquire the Premises, the Bank further reserves the right at any time to:
      i. request and receive from the issuer an Appraisal and the Title Insurance Policy;
      ii. with respect to the Premises, request and receive from the Borrower evidence of compliance with all applicable laws, ordinances, zoning regulations, etc. promulgated by any government agency, department, or subdivision and any and all amendments thereto. Such compliance shall include, but not be limited to, approvals required by the U.S. Environmental Protection Agency and the Department of Housing and Urban Development (HUD) Flood Disaster Act of 1973, where applicable. The Borrower shall provide the Bank with such evidence respecting the security and its flood plain status as may be requested by the Bank and shall provide flood plain insurance where appropriate;
      iii. request and receive from the Borrower written assurance that there are no existing, threatened or pending actions by any civic group or governmental authority against the Premises or adjacent property which would have a materially adverse effect on such properties;

iv. request and receive from the Borrower a certificate of a registered engineer and land surveyor containing such certifications pertaining to the Premises as the Bank may require;

v. request and receive from the Borrower a certified survey showing all easements affecting the Premises, and the points of access to the main road upon which the Premises front;

vi. request and receive from the issuer an environmental site assessment pertaining to the Premises prepared by a qualified environmental engineer satisfactory to the Bank and verification that no "notice of violation," claim, fine, penalty, or other matter has been issued by any regulatory body pursuant to the applicable environmental laws, such reports to include test samples, agency records review, and such other studies as the Bank, which such report shall be satisfactory to the Bank, in its sole discretion, may require.

## V. COVENANTS.

The Borrower covenants and agrees that it will:

1. a. **Legal Existence; Insurance; Etc.** Keep in full force and effect its legal existence (if a corporation, partnership, limited liability company or trust), rights, licenses, permits and franchises and operate its business as conducted prior to the date hereof; maintain all property used in the conduct of its business and keep the same in good repair, working order and condition; and maintain adequate insurance on its properties against fire, theft, and extended coverage risks and against public liability and property damage and products liability and such other risks as may be required by law or as may be reasonably required by the Bank, in such form, for such periods, and written by such companies as may be satisfactory to the Bank, such insurance in the case of a secured loan to name the Bank as additional insured and/or mortgagee/loss payee. All policies of insurance shall provide for at least twenty (20) days' written notice to the Bank prior to cancellation or change in the coverage, scope or amount of any such policy or policies. Borrower shall furnish the Bank with certificates of compliance with the foregoing insurance provision.

   b. **Compliance with Laws.** Comply with all present and future applicable laws, ordinances, rules, regulations, directives and other requirements of all governmental instrumentalities, including without limitation those relating to Hazardous Substances, within such time periods as required thereby, with time being of the essence.

2. **Operation of Business.** Maintain and operate its business in a proper and efficient manner.

3. **Payment of Taxes.** Pay and discharge all taxes, assessments, and governmental charges imposed upon Borrower, its income or its property before the same shall be in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien upon any such properties.

4. **Financial Statements.** Furnish to the Bank:

   a. promptly, from time to time as requested by the Bank, and in all events within one hundred twenty (120) days after the close of each applicable party's tax year, (i) with respect to the Borrower and all corporate, partnership or trust guarantors, financial statements (audited if requested), balance sheets, profit and loss statements, together with supporting schedules, signed and in such form as may be acceptable to the Bank; (ii) with respect to all individual guarantors, signed personal financial statements; and (iii) with respect to all entities and individuals referred to in (i) and (ii), current Federal income tax returns (with all schedules and exhibits), or in the case of a partnership, Form 1065 (with all schedules and exhibits). In any event, all the documents referred to in this subparagraph (a), regardless of when last submitted, must be submitted to the Bank, as often as the Bank shall deem necessary, if there occurs a Material Adverse Change.

   b. promptly, from time to time, such other information regarding the operations, assets, business, affairs and financial condition of the Borrower and all guarantors, as the Bank may reasonably request; and

   c. with respect to all personal financial statements submitted by individual guarantors, such statements shall be on forms prescribed by the Bank.

5. **Inspection.** Permit agents or representatives of the Bank, at reasonable hours and upon reasonable notice, to inspect the Books and Records of the Borrower and to make abstracts or reproductions thereof, all at the Borrower's expense.

6. **Adverse Changes.** Promptly advise the Bank of any Material Adverse Change.

7. **Accounting System.** Maintain a standard system of accounting in accordance with generally accepted accounting principles.

8. **Depository.** Maintain the Bank as the Borrower's principal depository.

9. **Indebtedness.** Not incur or permit to exist any indebtedness or liability except indebtedness to the Bank or any Bank affiliate, indebtedness with respect to warranty, trade obligations and other liabilities incurred in the ordinary course of business, and any indebtedness or liability permitted in writing by the Bank.

10. **Liens.** Not create, assume or suffer to exist any mortgage, security interest, or lien on any of its assets, now or hereafter owned, other than liens securing indebtedness to the Bank or any Bank affiliate, liens securing the payment of taxes not yet due, liens imposed by law (other than for borrowed money), liens incurred by the Borrower in good faith in the ordinary course of business, and other liens permitted in writing by the Bank.

11. **Guaranties; Etc.** Not guarantee, endorse or otherwise become or be responsible for obligations of any other person or entity, whether by agreement to purchase the indebtedness of any other person or entity or agreement for the furnishing of funds to any

other person or entity through purchase of Goods, supplies or services, or by way of stock purchase, capital contribution, advance or loan, for the purpose of paying or discharging any indebtedness or obligation of such other person or entity, or otherwise, except endorsements of negotiable instruments for collection in the ordinary course of business.

12. **Investments.** Not purchase, invest in or otherwise acquire or hold Securities including, without limitation, capital stock (including closely held stock) and evidences of indebtedness of, or make loans or advances to, or enter into any arrangement for the purpose of providing funds or credit to, any other person or entity (including, without limitation, all Affiliates of the Borrower), except investments in short-term obligations of the United States and certificates of deposit issued by the Bank or any Bank Affiliate.

13. **Sales of Accounts and Instruments.** Not sell, assign, discount or dispose of any Accounts or Instruments held by the Borrower, with or without recourse, except for collection (including endorsements) in the ordinary course of business.

14. **Sales and Transfers.** Not sell, assign, lease, transfer, sell and leaseback, or otherwise dispose of all or any material amount of its assets not in the ordinary course of business to any person or entity or turn over the management of, or enter into a management contract with respect to, such assets.

15. **Valuation.** Not write up (by creating an appraisal surplus or otherwise) the value of any capital assets above their cost less the depreciation regularly allowable thereon.

16. **Fundamental Changes.** Not dissolve, liquidate, consolidate with or merge with any corporation, limited liability company or other entity or agree to do any of the foregoing.

17. **Distributions.** If a corporate Borrower, not declare or pay any dividends, or make any distribution to holders of shares of its capital stock (and on account of such capital stock) of cash, capital stock or other property, or directly or indirectly, redeem, purchase or otherwise acquire any shares of its capital stock of any class; and if a partnership or limited liability company Borrower, not permit the return or withdrawal of any capital contributions; provided, however, that if the Borrower is an "S" Corporation under the Internal Revenue Code, the Borrower may make annually such cash distributions to its shareholders as shall equal the sum of federal income taxes which are allocable to such shareholders' income received or deemed to have been received on account of such shareholders' capital stock in the Borrowe.

18. Additional Covenants. Comply with the additional covenants, if any, set forth on affixed Exhibit A-1.

**VI. SECURITY AGREEMENT AND OTHER SECURITY DOCUMENTS.**

In addition to any Collateral which may be provided for in Part VI of this Agreement, the Loan is secured by one or more of the following additional documents: Collateral Assignment(s) of Leases, Real Estate Mortgage(s).

1. **Security Interest; Collateral; Obligations.** The Borrower hereby grants to the Bank, as security for any and all obligations whatsoever of the Borrower to the Bank, whether direct, indirect, absolute or contingent, due or to become due, and whether now existing or hereafter arising and howsoever evidenced or acquired, including without limitation all indebtedness and liabilities evidenced by the Loan, this Agreement, interest rate swap agreements, interest rate cap agreements, interest rate floor agreements, interest rate hedging agreements, or other similar agreements or arrangements related to the foregoing, the other Loan Documents, checking account overdrafts, and letter of credit reimbursement agreements, excluding, however, indebtedness incurred primarily for personal, family or household purposes (collectively, the "Obligations"), a first lien on, and a security interest in and agrees and acknowledges that the Bank has and will continue to have a first lien on and a perfected security interest in all of the Collateral described below, both presently owned and after acquired, together with all proceeds and products thereof, additions and accessions thereto, and all replacements and substitutions therefor (collectively, the "Collateral"), excluding, however, all such Collateral which constitutes Consumer Goods in the hands of the Borrower: .

2. Borrower hereby warrants, covenants and agrees that:

   a. **Title; Adverse Liens.** Except for prior security interests disclosed on Exhibit A-2 (if any) and except for the security interest granted hereby, the Borrower is the owner of presently owned Collateral and will be the owner of Collateral hereafter acquired free from any lien or encumbrance (other than those in favor of the Bank), and Borrower will defend the Collateral against the claims and demands of all persons at any time claiming the same or any interest therein.

   b. **Financing Statements.** Except for financing statements evidencing the security interests which may be listed on Exhibit A-2 (if any), no financing statements covering any Collateral are on file in any public office. At the request of the Bank, the Borrower will execute one or more (i) financing statements pursuant to the UCC; (ii) title certificate lien application forms; and (iii) other documents necessary or advisable to perfect the security interests evidenced hereby, all in form satisfactory to the Bank. Where allowed by law, the Borrower hereby irrevocably authorizes the Bank to file financing statements and amendments without the signature of the Borrower. The Borrower will pay the cost of filing the aforesaid documents or filing or recording this Agreement in all public offices wherever filing or recording is deemed by the Bank to be necessary or desirable.

   c. **Adverse Liens.** The Borrower will keep the Collateral free from any future adverse liens.

d. **Taxes.** The Borrower will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement and any of the other Loan Documents.

e. **Insurance.** With respect to all required insurance policies and coverage, the Bank may act either in its name or as attorney for the Borrower (for that purpose by these presents duly authorized and appointed with full power of substitution and revocation) in obtaining, adjusting, settling and canceling such insurance and endorsing any drafts in payment of any loss.

f. **Preservation of Collateral.** The Bank may, at its election, discharge taxes and liens levied or placed on the Collateral, pay for insurance on the Collateral and pay for the maintenance and preservation of the Collateral. The Borrower agrees to reimburse Bank on demand for any payment made, or any expense incurred by the Bank pursuant to the foregoing authorization, and in any event all such payments and expenses shall constitute an Obligation hereunder. If the Borrower fails to insure Collateral as required by this Agreement or any of the Loan Documents, the Borrower shall pay to the Bank on the date of such failure a nonrefundable fee for each such failure equal to the sum of (i) $100 plus (ii) the amount of the insurance premium cost incurred by the Bank. Notwithstanding the foregoing, neither the charging or payment of such fee nor this provision shall in any way be deemed to waive or imply or constitute a basis for waiver of any default occasioned by Borrower's failure to comply with the insurance requirements of this Agreement or any of the Loan Documents.

g. **Possession and Use.** Other than with respect to Collateral in which the Bank's security interest is perfected by the Bank's possession thereof, such as instruments, documents, cash, bank accounts, etc., which so long as any of the Obligations remain outstanding and unpaid shall remain in the possession of the Bank, until an Event of Default, the Borrower may have possession of the Collateral, provided that the Borrower will not use the Collateral in any unlawful manner or in a manner inconsistent with this Agreement, the Loan Documents, or any policy of insurance thereon.

h. **Power of Attorney.** The Borrower irrevocably designates and appoints the Bank its true and lawful attorney with full power of substitution and revocation to execute, deliver, and record in the name of the Borrower all financing statements, amendments, continuation statements, title certificate lien applications and other documents deemed by the Bank to be necessary or advisable to perfect or to continue the perfection of the security interests granted hereunder.

i. **Reproduction as Financing Statement.** A carbon, photographic, or other reproduction of a security agreement or a financing statement is sufficient as a financing statement.

j. **Remedies.** If an Event of Default occurs, the Bank shall have the rights and remedies provided in this Agreement, including without limitation in Part VII hereof. In addition, the Bank may exercise and shall have any and all rights and remedies accorded it by the UCC. The Bank may require the Borrower to assemble the Collateral and make it available to the Bank at a place to be designated by the Bank which is reasonably convenient to both parties. The requirement of reasonable notice shall be met, if notice is mailed, postage prepaid, to the Borrower or other person entitled thereto at least ten (10) days (including non-business days) before the time of sale or disposition of the Collateral. The Bank at its option may have a receiver appointed to take possession of the Collateral, to use and operate the Collateral, to collect the profits and proceeds therefrom, and to apply the same as the court may direct. The Borrower agrees that the Bank's legal remedies are inadequate and that the Bank shall be entitled to obtain equitable relief upon the occurrence of an Event of Default. The Borrower shall pay to the Bank on demand all expenses, including reasonable legal expenses and attorney's fees (which may include costs allocated by the Bank's internal legal department), incurred or paid by the Bank in protecting or enforcing any rights of the Bank hereunder, including its right to take possession of the Collateral, storing and disposing of the same or in collecting the proceeds thereof.

k. **Notification of Account Debtors.** The Bank shall have the right to demand from the Borrower a list of all Accounts and to notify any and all account debtors to make payment thereof directly to the Bank. The Borrower irrevocably designates and appoints the Bank its true and lawful attorney with full power of substitution and revocation in its own name or in the name of the Borrower to demand, collect, receive, receipt for, and sue for all amounts due and to become due on the Accounts and to endorse the name of the Borrower on all commercial paper given in payment or part-payment thereof and in its discretion to file any claim or take any other action which the Bank may deem necessary or appropriate to protect and preserve and realize upon the security interest of the Bank in the Accounts or the proceeds thereof. The Bank shall also have the right to (i) open all mail addressed to the Borrower; (ii) change the Post Office box or mailing address of Borrower; and (iii) use the Borrower's stationery and billing forms or facsimiles thereof, for the purpose of collecting Accounts and realizing upon the Collateral.

l. **Inspection and Appraisal.** The Bank and its agents and representatives (including without limitation appraisers, engineers, and other professionals) shall, upon reasonable advance notice, have access to the Borrower's premises for the purpose of inspecting and appraising the Collateral and/or performing environmental site assessments. All fees and expenses incurred by the Bank in connection with such inspections, appraisals and site assessments shall be payable by the Borrower to the Bank upon demand, and until paid in full, shall be secured by the Bank's security interests.

## VII. EVENTS OF DEFAULT.

1. **Listing of Events of Default.** The happening of any of the following events or conditions with respect to the Borrower, individually and collectively, shall constitute an "Event of Default":

a. any representation or warranty made herein or in any report, certificate, financial statement or other instrument furnished in connection with this Agreement or the Loan shall prove to be false or misleading in any material respect;

b. failure to pay the principal of, or interest on, the Note or any other indebtedness of the Borrower to the Bank, within ten (10) days from the date the same or any installment thereof shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or by acceleration or otherwise;
c. default in the due observance or performance of any other covenant, condition or agreement contained in this Agreement, any of the other Loan Documents, or in any other agreement or document evidencing or pertaining to Obligations, and such other default shall remain unremedied for ten (10) days;
d. the acceleration of the maturity of any of the Borrower's indebtedness other than to the Bank;
e. involvement in financial difficulties as evidenced by:
   i. an attachment made on the Borrower's property or assets which remains unreleased for a period in excess of forty-five (45) days; or
   ii. the inability to pay its debts (including without limitation taxes) generally as they become due; or
   iii. the appointment or authorization of a custodian as defined in the Bankruptcy Code; provided, however, that in the case of the appointment of a receiver in an involuntary proceeding such appointment continues in effect and undischarged for a period of thirty (30) days; or
   iv. the entry of an order for relief in a voluntary case under any chapter of the Bankruptcy Code; or
   v. the filing of an involuntary petition under any chapter of the Bankruptcy Code, which petition remains undismissed for a period of thirty (30) days; or
   vi. any other judicial modification or adjustment of the rights of Borrower's creditors;
f. final judgment for the payment in excess of an aggregate of Ten Thousand Dollars ($10,000.00) shall be rendered against the Borrower and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed;
g. any transfer (which shall include, without limitation, by sale, exchange, gift, pledge, hypothecation, or by other means except transfers by operation of law) to any person who is not presently a shareholder of a corporate Borrower or the spouse or child of a shareholder of a corporate Borrower of any voting capital stock of the Borrower, except any transfers of such shares upon the death of a shareholder either by will or by intestacy;
h. any transfer (as defined in (g)) to any person who is not presently a partner of a partnership Borrower or the spouse or child of a partner of a partnership Borrower of any partnership interest in the Borrower, except any transfer of such interest upon the death of a partner either by will or intestacy;
i. any transfer (as defined in (g)) to any person who is not presently a member of a limited liability company Borrower or the spouse or child of a member of a limited liability company Borrower of any membership interest in the Borrower, except any transfer of such interest upon the death of a member either by will or intestacy;
j. in the case of a trust Borrower, (i) any change in the beneficiaries of the trust; (ii) any dilution of the beneficial interest of one or more of the beneficiaries; or (iii) any change in the trustee or trustees;
k. the suspension of business for cause, other than strike, casualty or other cause beyond the Borrower's control and in the event of such suspension for cause beyond the Borrower's control, failure to resume operations as soon as possible;
l. dissolution or termination of the legal existence of the Borrower;
m. participation in any illegal activity or in any activity, whether or not related to the business of the Borrower, that may subject the assets of the Borrower to (i) a restraining order or any form of injunction issued by any federal or state court, or (ii) seizure, forfeiture or confiscation by any federal or state governmental instrumentality;
n. if the Bank believes in good faith, at any time, that either (a) the prospect of the Borrower's (i) repayment of the Loan or payment of any of its other obligations under the Loan Documents or (ii) performance of its duties thereunder is impaired or (b) there is any Material Adverse Change; or
o. with respect to any guaranty and/or subordination agreement included in the Loan Documents, the failure of the same to remain in full force and effect until the Loan is paid in full and this Agreement is terminated.

2. **Certain Cross-Defaults.** The happening of any event or condition set forth in subsection 1(e), (f), (l), or (m) above, with respect to a general partner of a partnership Borrower or any guarantor of the Loan shall likewise constitute an Event of Default.

3. **Acceleration.** If an Event of Default occurs, the Bank may declare all Obligations to be immediately due and payable.

## VIII. MISCELLANEOUS.

1. **Waiver of Event of Default.** No delay in accelerating the maturity of any Obligation shall affect the rights of the Bank later to take such action with respect thereto, and no waiver as to one Event of Default shall affect rights as to any other default.

2. **Notices.** Except as otherwise specifically provided for herein, any notice, demand or communication hereunder shall be given in writing (including facsimile transmission or telex) and mailed or delivered to each party at its address set forth below, or, as to each party, at such other address as shall be designated by such party by a prior notice to the other party in accordance with the terms of this provision. Any notice to the Borrower shall be sent as follows: ATLANTIS MANAGEMENT, LLC, 790 North Main Street, Providence, RI 02904. All notices hereunder shall be effective upon the earliest to occur of (i) five (5) business days after such notice is mailed, by registered or certified mail, postage prepaid (return receipt requested), (ii) upon

delivery by hand, (iii) upon delivery if delivered by overnight courier (such delivery to be evidenced by the courier's records), and (iv) in the case of any notice or communication by telex or telecopy, on the date when sent.

3. **Survival.** This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive any making by the Bank of the Loan and the execution and delivery of any Loan Documents and shall continue in full force and effect until this Agreement is terminated and all the Obligations are paid in full.

4. **Legal Fees and Expenses; Additional Fees and Charges.** The Borrower will pay all expenses incurred by the Bank in connection with the preparation of the Loan Documents, the making of the Loan, and the enforcement of the rights of the Bank in connection with this Agreement, any of the other Loan Documents and the Loan, including, but not limited to, the reasonable fees of its counsel (which may include costs allocated by the Bank's internal legal department), plus the disbursements of said counsel. Borrower further agrees to pay to the Bank on demand all reasonable fees, costs and expenses incurred by the Bank in connection with the administration of the Loan, including, without limitation, overnight courier fees, lien search fees, and filing and recording fees. The Borrower agrees to pay on demand the Bank's service fees and charges for administrative costs as in effect from time to time (including, without limitation, such fees and charges as may be expressly provided for in this Agreement). Any such fee or charge may be implemented by the Bank from time to time or, in the case of any such existing fee or charge, the amount thereof may be increased by the Bank from time to time, in each instance, in or to such amount as the Bank in its sole discretion deems reasonable.

5. **Choice of Law.** This Agreement and all the other Loan Documents shall be construed in accordance with and governed by the local laws (excluding the conflict of laws rules, so-called) of the State.

6. **Written Modification and Waiver.** No modification or waiver of any provision of this Agreement or of any of the other Loan Documents nor consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in the same, similar or other circumstances.

7. **Accounting Practice.** All matters involving accounting practice are to be determined both as to classification of items and amounts in accordance with generally accepted principles of accounting practice consistently applied by the Borrower's accountants in the preparation of its previous annual financial statements.

8. **Documentation.** All documents required hereunder shall be in form and substance satisfactory to the Bank.

9. **Replacement Documents.** Upon receipt of an affidavit of an officer of the Bank as to the loss, theft, destruction or mutilation of the Note or any security document which is not of public record, and, in the case of any such loss, theft, destruction, mutilation, upon cancellation of such Note or other security document, the Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

10. **Joint and Several Obligations.** If this Agreement is signed by more than one Borrower, all obligations of the Borrowers are their joint and several obligations, and all references to the Borrower herein shall be deemed to refer to each of them, either of them, and all of them.

11. **Unenforceability.** In the event any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

12. **Cumulative Remedies; Setoff.** The rights and remedies provided the Bank in this Agreement and in the other Loan Documents shall be cumulative and shall be in addition to and not in derogation of any rights or remedies provided the Bank in any other document, instrument or agreement or under applicable law or otherwise, and may be exercised concurrently or successively. The Borrower hereby grants to the Bank, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to the Bank, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any entity under the control of FleetBoston Financial Corporation and its successors and assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by the Borrower), the Bank may setoff the same or any part thereof and apply the same to any liability or obligation of the Borrower and any guarantor even though unmatured and regardless of the adequacy of any other collateral securing the Loan. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

13. **Assignments and Participations.** The Borrower agrees that the Bank shall have the right at all times to sell all or any portion of the Loan and all Loan Documents, and to grant one or more participations in the Loan and in all Loan Documents. In connection therewith, the Borrower hereby irrevocably authorizes the Bank to deliver to each such purchaser, participant and

prospective purchaser and prospective participant originals and copies of all Loan Documents and all financial statements and other credit and factual data from time to time in the Bank's possession which relate to the Borrower and/or all guarantors, if any, of the Loan. The Borrower further agrees that the Bank shall have the right at all times to disclose and report to credit reporting agencies such information pertaining to the Borrower and/or all guarantors, if any, as is consistent with the Bank's policies and practices from time to time in effect.

14. **Option to Cure.** The Bank, at its election and in its sole discretion, may (but shall not be obligated to) cure any failure on the part of Borrower or any occupant of the Premises (such other occupant hereinafter referred to as a "User") to comply with the appropriate environmental laws, such cure may include, without limitation, the following actions:

    a. arranging for environmental site assessments to be taken;
    b. arranging for the cleanup or containment of Hazardous Substances found in, on, adjacent to or surrounding the Premises and paying for such cleanup and containment costs and other costs associated therewith;
    c. paying on behalf of Borrower or any User any fines or penalties imposed on Borrower or any User by any federal, State, or local regulatory agency or in connection with Hazardous Substances; and
    d. making any other payment or performing any other act which may prevent a release of Hazardous Substances, facilitate the cleanup thereof, or prevent a lien from attaching to the Premises.

    Any partial exercise by the Bank of the remedies hereinabove set forth or any partial undertaking on the part of the Bank to cure the failure of Borrower or any User to comply with the appropriate environmental laws shall not obligate the Bank to complete any action taken or require the Bank to expend further sums to cure Borrower's or any User's noncompliance; and the exercise of any such remedies shall not place upon the Bank any responsibility for the operation, control, care, management or repair of the Premises, or make the Bank the "owner" or "operator" of the Premises or a "responsible party" within the meaning of any of the environmental laws. Any amounts paid or costs incurred by the Bank as a result of any of the above, together with interest thereon at the rate set forth in the Note from the date of payment, shall be paid by Borrower on demand of the Bank, and until paid shall be added to the unpaid principal of the Obligations and shall be secured by the security documents included in the Loan Documents. The Bank, by making any such payment or incurring any such costs, shall be subrogated to any rights of the Borrower or any User to seek reimbursement from any third parties, including without limitation a predecessor in interest to the Borrower's title to the Premises or any part thereof.

15. **Maximum Rate of Interest.** All provisions of this Agreement are expressly subject to the condition that in no event, whether by reason of acceleration of the maturity of the Loan or otherwise, shall the amount paid or agreed to be paid to the Bank hereunder and deemed interest under applicable law exceed the maximum rate of interest on the unpaid principal balance of the Loan allowed by applicable law (the "Maximum Allowable Rate"), which shall mean the law in effect on the date of this Agreement, except that if there is a change in such law which results in a higher Maximum Allowable Rate being applicable to this Agreement, then this Agreement shall be governed by such amended law from and after its effective date. In the event that fulfillment of any provision of this Agreement results in the interest rate hereunder being in excess of the Maximum Allowable Rate, the obligation to be fulfilled shall automatically be reduced to eliminate such excess. If, notwithstanding the foregoing, the Bank receives an amount which under applicable law would cause the interest rate set forth in this Agreement to exceed the Maximum Allowable Rate, the portion thereof which would be excessive shall automatically be applied to and deemed a prepayment of the unpaid principal balance of the Loan and not a payment of interest.

16. **Pledge to Federal Reserve.** The Bank may at any time pledge or assign all or any portion of its rights under the Loan Documents [including any portion of the promissory note] to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release the Bank from its obligations under any of the Loan Documents.

17. **WAIVER OF JURY TRIAL. THE BORROWER WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND ANY OF THE OTHER LOAN DOCUMENTS, AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.**

18. **Jurisdiction and Venue.** The Borrower irrevocably consents that any legal action or proceeding against it or any of its property with respect to any matter arising under or relating to this Agreement and the other Loan Documents may be brought in any court of the State, or any Federal Court of the United States of America located in the State, as the Bank may elect, and by execution and delivery of this Agreement the Borrower hereby submits to and accepts with regard to any such action or proceeding, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The Borrower further irrevocably consents to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Borrower at its address set forth herein. The foregoing, however, shall not limit the Bank's rights to serve process in any other manner permitted by law or to bring any legal action or proceeding or to obtain execution of judgment in any other jurisdiction. The Borrower irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement and the other Loan Documents, and further irrevocably waives any claim that the State is not a convenient forum for any such suit, action or proceeding.

19. **Presentment; Etc.** The Borrower waives presentment, notice of dishonor, protest, notice of non-payment, demand and other notice of any kind.

20. **Debit.** The Borrower hereby irrevocably authorizes the Bank and any subsequent holder of the Note, both before and after demand, to debit any of the Borrower's business accounts maintained with the Bank (or subsequent holder) for all sums (including without limitation principal, interest, late fees, and other fees) payable from time to time under this Agreement and the other Loan Documents. In addition, if the Borrower has signed a separate authorization, the Bank is authorized to initiate ACH debit transfers for the Loan payments and on the business account(s) specified in the authorization. These provisions shall not obligate the Bank to create or allow any overdraft, and such authority shall not relieve the Borrower of the obligation to assure that payments are made when due.

21. **Integration.** The Loan Documents supersede all prior agreements between the parties with respect to the Loan, whether oral or written, including, without limitation, all correspondence between counsel for the respective parties. The Loan Documents constitute the entire agreements between the parties with respect to the Loan, and the rights, duties, and obligations of the parties with respect thereto.

22. **Lender Liability.** The Bank shall not be liable for any loss sustained by any party resulting from any action, omission, or failure to act by the Bank, whether with respect to the exercise or enforcement of the Bank's rights or remedies under the Loan Documents, the Loan, or otherwise, unless such loss is caused by the actual willful misconduct of the Bank conducted in bad faith. **IN NO EVENT SHALL THE BANK EVER BE LIABLE FOR CONSEQUENTIAL OR PUNITIVE DAMAGES, ANY RIGHT OR CLAIM THERETO BEING EXPRESSLY AND UNCONDITIONALLY WAIVED.**

23. **Bank's Decisional Standards.** To the extent that applicable laws require the Bank's actions or decisions under the Loan Documents to be conducted in good faith, the term "good faith" shall be defined (using a subjective standard) as honesty in fact with regard to the conduct or transaction concerned based upon the facts and circumstances actually known to the individual(s) acting for the Bank, and such requirement may be satisfied by reliance upon the advice of attorneys, accountants, appraisers, architects, engineers, or other qualified professionals.

24. **Descriptive Headings; Context.** The captions in this Agreement are for convenience of reference only and shall not define or limit any provision. Whenever the context requires, reference in this Agreement to the neuter gender shall include the masculine and/or feminine gender, and the singular number shall include the plural, and, in each case, vice versa.

25. **Acknowledgment of Copy.** The Borrower acknowledges that it has received a fully executed copy of this Agreement.

IN WITNESS WHEREOF, the Borrower and the Bank, by persons duly authorized, have executed this Agreement as of June 12 , 2002

WITNESS:

[signature]
Witness:
Marc A. Soucy

ATLANTIS MANAGEMENT, LLC

By: [signature]
Name: Tarek W. Wehbe
Title: Authorized Member

Fleet National Bank

[signature]
Witness.

By: [signature]
Name: Daniel J Price
Title: Vice President

## EXHIBIT A-1

**Reference to V. 18: Additional Covenants**
The Borrower shall comply with the following additional requirements:

1. **Ratio of Net Operating Income.** Maintain at all times throughout the term of this Agreement a ratio of Net Operating Income (less dividends and distributions) of the Borrower and Net Operating Income (less dividends and distributions) of the Real Estate Affiliate to the sum of (i) interest expense on all obligations of the Borrower and Real Estate Affiliate and (ii) all regularly scheduled principal reductions under the Note and under other indebtedness of the Borrower and Real Estate Affiliate of not less than 1.2:1. Net Operating Income is defined as net income (loss) after taxes, plus depreciation expense, plus amortization of goodwill and other intangible assets, plus interest expense accrued on all interest bearing obligations. Real Estate Affiliate is defined as an Affiliate of Borrower that holds real property from which the Borrower operates.
2. **Ratio of Total Liabilities to Tangible Net Worth.** Maintain at all times throughout the term of this Agreement a ratio of total liabilities to Tangible Net Worth no greater than 3.0:1. Tangible Net Worth is defined as the amount by which total assets exceeds total liabilities, excluding, however, from the determination of total assets: (i) intangible assets, (ii) interests of less than 51% of any other corporation or business entity, and (iii) amounts due from Affiliates of Borrower.
3. **Fiscal Year Financial Statements.** Borrower shall provide within 120 days of its fiscal year end **compiled fiscal financial statements and the Federal income tax return** for the year then ended, including a balance sheet, an income statement, a statement of cash flows, and all related schedules, prepared by an independent certified public accountant in accordance with generally accepted accounting principles.
4. The Individual Guarantors shall provide within 120 days of its fiscal year end **personal financial statements** for the year then ended to be submitted annually.

**EXHIBIT A-2**

**Prior Security Interests in Collateral**
N/A

**EXHIBIT A-3**

**Location of Equipment**
N/A

**Location of Inventory**
N/A

**Offices Containing Records of Accounts**
N/A

**EXHIBIT A-4**

**Description of Real Estate**
790 North Main Street, Providence, RI 02904

**Name(s) of Record Owner**
ATLANTIS MANAGEMENT, LLC

Fleet

SWAP AGREEMENT dated as of **June 12, 2002**, between Fleet National Bank ("Fleet") and **Atlantis Management LLC.**, (jointly and severally if there is more than one, "Counterparty").

WHEREAS, Counterparty (a) has entered into a term loan agreement dated as of **June 12, 2002** (the "Loan Agreement") with Fleet pursuant to which Counterparty has received or will receive a term loan (the "Loan") and (b) desires to enter into a swap transaction;

Accordingly, the parties agree as follows:

1. Inconsistency; Definitions. In the event of any inconsistency between the provisions of the Schedule to the Swap Agreement (the "Schedule") attached to this Agreement and the other provisions of this Agreement, the Schedule will prevail. As used in the Agreement:

"Calculation Period" means, with respect to any Payment Date, the period from, and including, the immediately preceding Payment Date and extending to, but excluding, such Payment Date.

"Counterparty Payment Amount" means, with respect to any Payment Date, an amount equal to the product of (a) the Counterparty Rate specified in the Schedule multiplied by (b) the Notional Amount specified in the Schedule for the immediately preceding Payment Date multiplied by (c) the actual number of days in the relevant Calculation Period divided by 360.

"Event of Default" means, with respect to a party, the occurrence at any time with respect to such party of any of the following events: (a) failure by the party to make, when due, any payment under this Agreement if such failure is not remedied on or before the third New York Banking Day after notice of such failure is given to the party, (b) failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement) to be complied with or performed by the party in accordance with this Agreement if such failure shall remain unremedied for ten days, (c) a representation made by the party in this Agreement proves to have been incorrect or misleading in any material respect when made, (d) the party (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or

Fleet

"Payment Date" means each date specified as such in the Schedule or, if such day is not a New York Banking Day, the first following day that is a New York Banking Day.

"Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money, as well as reimbursement obligations in respect of letters of credit, financial guaranty insurance or surety bonds issued for the account of that person and trade debt incurred other than through borrowings.

2. Payments under Swap; Adjustment of Loan Terms.

(a) Payment Obligations. Subject to Sections 2(c) and 2(d), on each Payment Date (other than the date hereof), (i) if the Fleet Payment Amount exceeds the Counterparty Payment Amount, Fleet shall pay to Counterparty the excess of the Fleet Payment Amount over the Counterparty Payment Amount and (ii) if the Counterparty Payment Amount exceeds the Fleet Payment Amount, Counterparty shall pay to Fleet the excess of the Counterparty Payment Amount over the Fleet Payment Amount.

(b) Adjustment of Loan Terms. Counterparty shall not prepay the Loan in part without prior written notice to Fleet. Subject to Sections 2(c) and 2(d), if Counterparty elects to prepay the Loan in whole or in part, (i) Counterparty shall notify Fleet of the amount and date of prepayment on or prior to such date, (ii) Fleet shall revise the notional principal table contained in the Schedule to reflect the revised amortization schedule for the Loan and shall send Counterparty a copy of the revised notional principal table, (iii) Fleet shall calculate in good faith and in a commercially reasonable manner the aggregate termination amount required to be paid by one party to the other party as a result of the change in the notional principal table (including, without limitation, the Fleet Payment Amount and Counterparty Payment Amount that would have been payable in respect of the reduction in the Notional Amount for the period from the Payment Date immediately preceding Counterparty's prepayment through the date of prepayment) and (iv) Fleet or Counterparty, as the case may be, shall pay to the other party such amount by the second New York Banking Day following Fleet's effective notice to Counterparty of such amount.

(c) Conditions Precedent. Each payment obligation of each party under Sections 2(a) and 2(b) is subject to the condition precedent that (i) no Event of Default or event which, with the giving of notice or lapse of time or both, would constitute an Event of Default with respect to the other party has occurred and is continuing and (ii) no Early Termination Date has been designated.

(d) Debit Authorization. If Debit Authorization is specified in the Schedule as applicable, Counterparty irrevocably authorizes Fleet to debit any of the Counterparty's business accounts maintained with Fleet for all amounts payable by Counterparty from time to time in connection with this Agreement. This Debit Authorization shall not obligate Fleet to create or allow any overdraft, and such Debit Authorization shall not relieve Counterparty of the obligation to assure that payments are made when due. If Debit Authorization is specified in the Schedule as inapplicable, Counterparty shall pay Fleet in freely transferable funds to the account

Fleet

designated by Fleet in the Schedule or otherwise. If Fleet owes an amount to Counterparty, Counterparty hereby authorizes Fleet, in its discretion, either to apply such amount to the Loan or to credit such amount to the account designated by Counterparty in the Schedule or otherwise.

(e) Default Interest. Prior to the designation of an Early Termination Date, a party that defaults in the performance of any payment obligation will, to the extent permitted by law, be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Counterparty Rate plus five percent per annum. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

3. Consequences of an Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days' notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date. Upon the designation of an Early Termination Date, no further payments under Section 2 above will be required to be made and Fleet shall calculate in good faith and in a commercially reasonable manner the net termination amount required to be paid by the Defaulting Party or the Non-defaulting Party, as the case may be, to the other party as the result of the early termination of this Agreement, which amount shall be payable, subject to Section 5(c) below, on the day that Fleet's notice to Counterparty of the amount payable is effective. Such amount shall be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the Early Termination Date to (but excluding) the date such amount is paid, at a rate per annum equal to the Fleet Rate (in the case of an amount owed by the Non-defaulting Party) or twenty percent (in the case of an amount owed by the Defaulting Party). Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including, but not limited to, legal fees (which may include costs allocated by Fleet's internal counsel) and disbursements, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or by reason of the early termination of this Agreement, including, but not limited to, costs of collection.

4. Representations and Covenants.

(a) Counterparty makes the following representations: (i) it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing; (ii) it has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and has taken all necessary action to authorize such execution, delivery and performance; (iii) such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of

Fleet

government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets; (iv) all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with; (v) its obligations under this Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law); and (vi) all information that is furnished in writing to Fleet by or on behalf of Counterparty is, as of the date of the information, true, accurate and complete in every material respect.

(b) If Eligible Contract Participant is specified in the Schedule as applicable, each party represents and warrants to the other party that it is either (i) a depository institution (as defined in Section 3 of the Federal Deposit Insurance Act) or (ii) a corporation, partnership, proprietorship, organization, trust, or other entity (A) that has total assets exceeding $10,000,000, (B) the obligations of which under this Agreement are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by a bank or by an entity referred to in clause (i) or (ii)(A) above, or (C) that has a net worth of $1,000,000 and is entering into this Agreement (x) in connection with the conduct of its business or (y) to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by it in the conduct of its business. If Eligible Contract Participant is specified in the Schedule as inapplicable, each party (i) represents and warrants to the other party that it has entered into this Agreement in conjunction with its line of business (including financial intermediation services) or the financing of its business and (ii) acknowledges and agrees that (A) this Agreement is terminable, absent default, only with the consent of the other party or upon and to the extent of prepayment of the Loan, (B) this Agreement constitutes a swap agreement and is not one of a fungible class of agreements that are standardized as to their material economic terms, (C) the material terms of this Agreement and the Loan Agreement have been subject to individual negotiation by the parties, and (D) the creditworthiness of the other party was a material consideration in entering into or determining the terms of this Agreement, including pricing, cost or credit enhancement terms of this Agreement.

(c) Counterparty represents that (i) it is acting for its own account, (ii) it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands, accepts and has made its own independent decisions with respect to (based on its own judgment and upon advice from such advisors as it has deemed necessary), the terms, conditions, risks and appropriateness of this Agreement, (iii) it is not relying on any communications of Fleet or its affiliates as investment advice or as a recommendation to enter into this Agreement, and (iv) Fleet and its affiliates are not acting as a fiduciary for or an advisor to it in respect of this Agreement.

(d) Counterparty agrees to complete, accurately and in a manner reasonably satisfactory to Fleet, execute and deliver to Fleet a United States Internal Revenue Service Form W-9, or any successor form, (i) upon execution of this Agreement; (ii) promptly upon reasonable

demand by Fleet; and (iii) promptly upon learning that any Form W-9 (or any successor thereto) previously provided by Counterparty has become obsolete or incorrect.

(e) Counterparty agrees to deliver to Fleet upon execution of this Agreement (i) a certificate of an authorized officer for Counterparty and any guarantor of Counterparty's obligations hereunder certifying the authority, names and true signatures of the officers signing this Agreement and any related guarantee, reasonably satisfactory in form and substance to Fleet, (ii) certified copies of documents evidencing each action taken by Counterparty and such guarantor to authorize its execution of this Agreement or such guarantee, as the case may be, and the performance of its obligations hereunder or under such guarantee, as the case may be, and (iii) certified copies of its bylaws and articles of incorporation or other constituent documents.

5. Miscellaneous.

(a) Fleet shall calculate the amounts required to be calculated hereunder and Fleet's determinations and calculations shall be binding in the absence of manifest error. If any interest rate determined in accordance with the terms of this Agreement exceeds the maximum rate of interest allowed by applicable law (the "Maximum Allowable Rate"), that rate shall be such Maximum Allowable Rate. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto. This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(b) No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties. Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that Fleet may transfer its rights and obligations hereunder, in whole but not in part, to any of its affiliates. Any purported transfer in violation of this Section 5(b) shall be null and void.

(c) If, but for this sentence, Fleet would be obligated to pay an amount pursuant to Section 3 above at a time when any amount is payable (whether at such time or in the future or upon the occurrence of any contingency) by Counterparty to Fleet or its affiliates under any other agreement between them including, but not limited to, any transaction which is a rate swap transaction or forward rate swap transaction, or any instrument or undertaking of Counterparty (each such amount, an "Other Obligation"), Fleet is hereby authorized by Counterparty to set off the obligation hereunder against any Other Obligation without prior notice. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege. The rights, powers, remedies and privileges

Fleet

provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(d) This Agreement will be governed by and construed in accordance with the laws of the State of New York (without giving effect to choice of law doctrine).

(e) In the event that any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which is held invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

(f) **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDINGS. AS TO ANY MATTER FOR WHICH A JURY TRIAL CANNOT BE WAIVED, EACH PARTY AGREES NOT TO ASSERT ANY SUCH MATTER AS A CROSS CLAIM OR COUNTERCLAIM IN, NOR MOVE TO CONSOLIDATE THE SAME WITH, ANY LEGAL PROCEEDING IN WHICH A JURY TRIAL IS WAIVED.**

(g) Each party consents to the monitoring or recording, at any time and from time to time, by the other party of any and all communications between officers or employees of the parties, waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording.

(h) Any notice or other communication in respect of this Agreement may be given in any manner identified in this Section 5(h) (except that a notice or other communication under Section 3 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided below and will be deemed effective as indicated: (i) if in writing and delivered in person or by courier, on the date it is delivered; (ii) if sent by telex, on the date the recipient's answerback is received; (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine); (iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or (v) if sent by electronic messaging system, on the date that electronic message is received, unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a New York Banking Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a New York Banking Day, in which case that communication shall be deemed given and effective on the first following day that is a New York Banking Day. Either party may by notice to the other change the address, telex or facsimile number or electronic message system details at which notices or other communications are to be given to it.

Fleet

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document

| FLEET NATIONAL BANK | ATLANTIS MANAGEMENT LLC |
|---|---|
| By: [signature] | By: [signature] |
| Name: | Name: TAREK WEHBE |
| Title: | Title: Member |

By: [signature]
Name:
Title:

| Information for Notices: | Information for Notices: |
|---|---|
| Address: | Address: |
| Fleet National Bank<br>100 Federal Street MA DE 10013H<br>Global FX & Interest Rate Derivatives<br>Boston, Massachusetts 02110 | |
| Attention:<br>Documentation Unit | Attention:<br>Edgar Wehbe |
| Telephone No: (617) 434-8103 | Telephone No: 401-339-1827 |
| Facsimile No: (617) 434-3588/4284 | Facsimile No: |
| Telex: 144203 (Answerback: FLEETB1) | |

**Trade ID # 73876FB**

Fleet

Schedule to the Swap Agreement
dated as of June 12, 2002
between Fleet National Bank and Atlantis Management LLC

| | |
|---|---|
| Counterparty Rate: | 6.99000% percent per annum |
| Fleet Rate: | LIBOR |
| Spread: | 135.000 basis points |
| Designated Maturity: | One month |
| Debit Authorization: | Applicable |
| Eligible Contract Participant: | Inapplicable |
| Instructions for payments to Fleet: | 9418115463 |
| Instructions for payments to Counterparty: | 9418115463 |

Revised Notional Principal Table, See Attached

**Trade ID# 73876FB**

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 06/12/2002 | 476,000.00 |
| 07/12/2002 | 475,066.42 |
| 08/12/2002 | 474,132.84 |
| 09/12/2002 | 473,199.26 |
| 10/15/2002 | 472,265.68 |
| 11/12/2002 | 471,332.10 |
| 12/12/2002 | 470,398.52 |
| 01/13/2003 | 469,464.94 |
| 02/12/2003 | 468,531.36 |
| 03/12/2003 | 467,597.78 |
| 04/14/2003 | 466,664.20 |
| 05/12/2003 | 465,730.62 |
| 06/12/2003 | 464,797.04 |
| 07/14/2003 | 463,817.21 |
| 08/12/2003 | 462,837.38 |
| 09/12/2003 | 461,857.55 |
| 10/14/2003 | 460,877.72 |
| 11/12/2003 | 459,897.89 |
| 12/12/2003 | 458,918.06 |
| 01/12/2004 | 457,938.23 |
| 02/12/2004 | 456,958.40 |
| 03/12/2004 | 455,978.57 |
| 04/12/2004 | 454,998.74 |
| 05/12/2004 | 454,018.91 |
| 06/14/2004 | 453,039.08 |
| 07/12/2004 | 451,956.96 |
| 08/12/2004 | 450,874.84 |
| 09/13/2004 | 449,792.72 |
| 10/12/2004 | 448,710.60 |
| 11/12/2004 | 447,628.48 |
| 12/13/2004 | 446,546.36 |
| 01/12/2005 | 445,464.24 |
| 02/14/2005 | 444,382.12 |
| 03/14/2005 | 443,300.00 |
| 04/12/2005 | 442,217.88 |
| 05/12/2005 | 441,135.76 |
| 06/13/2005 | 440,053.64 |
| 07/12/2005 | 438,893.07 |
| 08/12/2005 | 437,732.50 |
| 09/12/2005 | 436,571.93 |
| 10/12/2005 | 435,411.36 |
| 11/14/2005 | 434,250.79 |
| 12/12/2005 | 433,090.22 |
| 01/12/2006 | 431,929.65 |
| 02/13/2006 | 430,769.08 |
| 03/13/2006 | 429,608.51 |

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 04/12/2006 | 428,447.94 |
| 05/12/2006 | 427,287.37 |
| 06/12/2006 | 426,126.80 |
| 07/12/2006 | 424,888.91 |
| 08/14/2006 | 423,651.02 |
| 09/12/2006 | 422,413.13 |
| 10/12/2006 | 421,175.24 |
| 11/13/2006 | 419,937.35 |
| 12/12/2006 | 418,699.46 |
| 01/12/2007 | 417,461.57 |
| 02/12/2007 | 416,223.68 |
| 03/12/2007 | 414,985.79 |
| 04/12/2007 | 413,747.90 |
| 05/14/2007 | 412,510.01 |
| 06/12/2007 | 411,272.12 |
| 07/12/2007 | 409,950.20 |
| 08/13/2007 | 408,628.28 |
| 09/12/2007 | 407,306.36 |
| 10/12/2007 | 405,984.44 |
| 11/13/2007 | 404,662.52 |
| 12/12/2007 | 403,340.60 |
| 01/14/2008 | 402,018.68 |
| 02/12/2008 | 400,696.76 |
| 03/12/2008 | 399,374.84 |
| 04/14/2008 | 398,052.92 |
| 05/12/2008 | 396,731.00 |
| 06/12/2008 | 395,409.08 |
| 07/14/2008 | 393,983.72 |
| 08/12/2008 | 392,558.36 |
| 09/12/2008 | 391,133.00 |
| 10/14/2008 | 389,707.64 |
| 11/12/2008 | 388,282.28 |
| 12/12/2008 | 386,856.92 |
| 01/12/2009 | 385,431.56 |
| 02/12/2009 | 384,006.20 |
| 03/12/2009 | 382,580.84 |
| 04/13/2009 | 381,155.48 |
| 05/12/2009 | 379,730.12 |
| 06/12/2009 | 378,304.76 |
| 07/13/2009 | 376,786.79 |
| 08/12/2009 | 375,268.82 |
| 09/14/2009 | 373,750.85 |
| 10/13/2009 | 372,232.88 |
| 11/12/2009 | 370,714.91 |
| 12/14/2009 | 369,196.94 |
| 01/12/2010 | 367,678.97 |

**ATLANTIS MANAGEMENT LLC**
**Amortization Schedule**

**Trade Type: SWAP** **Id: 73876FB**

| PAYMENT DATE | NOTIONAL AMOUNT |
|---|---|
| 02/12/2010 | 366,161.00 |
| 03/12/2010 | 364,643.03 |
| 04/12/2010 | 363,125.06 |
| 05/12/2010 | 361,607.09 |
| 06/14/2010 | 360,089.12 |
| 07/12/2010 | 358,441.47 |
| 08/12/2010 | 356,793.82 |
| 09/13/2010 | 355,146.17 |
| 10/12/2010 | 353,498.52 |
| 11/12/2010 | 351,850.87 |
| 12/13/2010 | 350,203.22 |
| 01/12/2011 | 348,555.57 |
| 02/14/2011 | 346,907.92 |
| 03/14/2011 | 345,260.27 |
| 04/12/2011 | 343,612.62 |
| 05/12/2011 | 341,964.97 |
| 06/13/2011 | 340,317.32 |
| 07/12/2011 | 338,555.36 |
| 08/12/2011 | 336,793.40 |
| 09/12/2011 | 335,031.44 |
| 10/12/2011 | 333,269.48 |
| 11/14/2011 | 331,507.52 |
| 12/12/2011 | 329,745.56 |
| 01/12/2012 | 327,983.60 |
| 02/13/2012 | 326,221.64 |
| 03/12/2012 | 324,459.68 |
| 04/12/2012 | 322,697.72 |
| 05/14/2012 | 320,935.76 |
| 06/12/2012 | |