# EXHIBIT C: June 12, 2002 Mortgage

BK5188PG055

#34

Fleet
Small Business Services

# MORTGAGE

ATLANTIS MANAGEMENT, LLC of 790 North Main Street, Providence, RI 02904 (jointly and severally if more than one, the "Mortgagor"), for good and valuable consideration paid, grant(s) to Fleet National Bank, a national banking association created and existing under the laws of the United States of America with its principal office located at 111 Westminster Street, Providence, RI 02903, ("Mortgagee"), WITH MORTGAGE COVENANTS, the land located in Providence, RI and more fully described on Exhibit A, together with all buildings and improvements now or hereafter located thereon (the "mortgaged premises").

TOGETHER WITH, and included as part of the mortgaged premises, all right, title and interest of the Mortgagor in and to the following property, rights and interests: (a) all easements, rights-of-way, streets, ways, alleys, passages, sewer rights, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the aforesaid real estate and all land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining said real estate to the center line thereof; (b) all machinery, apparatus, appliances, equipment, fittings, fixtures and other property of every kind and nature whatsoever owned by the Mortgagor, or in which the Mortgagor has or shall have an interest, now or hereafter affixed to the mortgaged premises, or located upon the mortgaged premises or appurtenant thereto and usable in connection with the present or future operation and occupancy of the mortgaged premises and all building equipment, materials and supplies of any nature whatsoever owned by the Mortgagor, or in which the Mortgagor has or shall have an interest, now or hereafter located upon the mortgaged premises, and together with any replacements therefor, additions thereto, and proceeds thereof; (c) all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the mortgaged premises, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right), or for any other injury to or decrease in the value of the mortgaged premises; (d) all Leases and Rents (both as hereinafter defined) of the mortgaged premises, all as now existing or hereafter entered into or arising; (e) all other agreements (including without limitation all utility, management, or similar agreements) affecting the use or occupancy of the mortgaged premises now or hereafter entered into; (f) all proceeds of and any unearned premiums on any insurance policies covering the mortgaged premises, including without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the mortgaged premises; (g) all benefits of any deposit or payments heretofore or hereafter made relating to the mortgaged premises; and (h) the right, in the name and on behalf of the Mortgagor, to appear in and defend any action or proceeding with respect to the mortgaged premises and to commence any action or proceeding to protect the interest of the Mortgagee in the mortgaged premises.

TO HAVE AND TO HOLD the mortgaged premises and said Rents and Leases, together with all the rights, privileges and appurtenances thereunto belonging, unto and to the use of Mortgagee and its successors and assigns forever.

**Obligations Secured.** This Mortgage is granted to secure the following:

the performance and observance by Mortgagor of Mortgagor's obligations to the Mortgagee under the following instruments (all collectively referred to as the "Debt Instruments"): All line of credit agreements, line of credit and term loan agreements, term loan agreements, loan agreements, interest rate swap agreements, interest rate cap agreements, interest rate floor agreements, interest rate hedging agreements, or other similar agreements or arrangements related to the foregoing and accompanying promissory notes by and between the Mortgagor and the Mortgagee, of even date with this Mortgage, in the aggregate maximum principal sum of $476,000.00 including without limitation all obligations from time to time of the Mortgagor to the Mortgagee on account of (i) letters of credit issued by the Mortgagee for the account of the Mortgagor and (ii) bankers' acceptances.

the payment by Mortgagor to Mortgagee of all sums incurred, expended or advanced by Mortgagee pursuant to any provision of this Mortgage;

the payment, performance and observance by Mortgagor of each and every covenant, condition and obligation contained in this Mortgage or referred to herein, or incurred in connection herewith; and

the payment of all other indebtedness now or hereafter owing by Mortgagor to Mortgagee (other than indebtedness incurred primarily for personal, family or household purposes), evidenced by a promissory note or agreement signed by Mortgagor, whether or not otherwise secured.

PROVIDED, NEVERTHELESS, that if Mortgagor, its heirs, personal representatives, successors or assigns, satisfies, pays and performs all of the Debt Instruments and other obligations secured hereby (including any notes or agreements evidencing future advances pursuant to paragraph 18 hereof), and any and all extensions, future amendments, modifications, renewals and replacements thereof, all of which are secured hereby, and until such time pays and performs all of Mortgagor's obligations, covenants and agreements set forth herein, then this Mortgage shall be null and void, otherwise it shall remain in full force and effect. It is an express condition of this Mortgage that it shall not be deemed satisfied or discharged until all terms and conditions set forth in the Debt Instruments have been met and until the Debt Instruments shall have been cancelled and terminated by the Mortgagee, with all terms and conditions thereof having been paid and satisfied in full without any renewal or replacement being issued and

notwithstanding that there may from time to time be zero balances outstanding under such Debt Instruments.

Mortgagor hereby represents and warrants that:

**Power and Authority.** Mortgagor has the requisite power and authority to own its properties and to carry on its business as now being conducted and as contemplated under this Mortgage and each Lease (as hereinafter defined) and to place mortgages and liens upon its assets; Mortgagor has full power and lawful authority to grant, sell and convey the mortgaged premises in the manner and form herein done.

**Compliance.** Mortgagor shall comply with all present and future applicable laws, ordinances, rules, regulations, directives and other requirements of all governmental instrumentalities, including without limitation those relating to Hazardous Substances, within such time periods as required thereby, with time being of the essence.

**Title.** Mortgagor has good and clear, record and marketable title in fee simple to the mortgaged premises subject only to the encumbrances set forth in Exhibit A attached hereto.

**Hazardous Substances.** Each reference in this Mortgage to "Hazardous Substances" shall be deemed to refer to any "chemical liquids," "hazardous material," "hazardous waste," "hazardous substances," "oil," "petroleum products," or "solid, liquid or gaseous products," as defined or referred to in or contemplated by any applicable federal, state, or local environmental law, statute, rule or regulation, and shall also include, without limitation, whether or not included in the definition contained in any such law, statute, rule or regulation, asbestos and other substances or materials which may pose a present or potential hazard to human health or the environment. Mortgagor has never released, generated, stored or disposed of any hazardous substances on the mortgaged premises in violation of any applicable environmental laws, and Mortgagor is not aware of the existence (except in full compliance with all applicable environmental laws), release or threat of release of any Hazardous Substances on or from the mortgaged premises or on or from any property adjacent to or surrounding the mortgaged premises, and for any breach of noncompliance by Mortgagor of its obligations under this Mortgage. The Mortgagor has not received any notice, order, claim or demand from the U.S. Environmental Protection Agency or any state or local governmental agency, authority or body having jurisdiction over Hazardous Substances or the storage or removal thereof with respect to the existence, release or threat of release of any Hazardous Substances. Notwithstanding anything to the contrary in the Mortgage, Mortgagor shall not agree to a deed restriction or other encumberance on the mortgaged premises relating to any Hazardous Substances without the prior written consent of the Mortgagee, which consent the Mortgagee may withhold in its sole discretion.

Mortgagor further covenants and agrees with Mortgagee as follows:

1. **Validity and Enforceability.** This Mortgage is and will remain a valid and enforceable lien on the mortgaged premises; Mortgagor will preserve such title, will forever warrant and defend the same to Mortgagee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons whatsoever, except the holders of the encumbrances, if any, as set forth in Exhibit A.
2. **Repair.** Mortgagor shall at all times keep and maintain the mortgaged premises and each part thereof in sound condition and in a first-class state of decoration and repair.
3. **Compliance.** Mortgagor promptly shall comply with all present and future laws, ordinances, rules, regulations, directives and other requirements of all governmental instrumentalities.
4. **Restrictions.** Mortgagor shall comply with all restrictive covenants and other private restrictions, if any, applicable to the mortgaged premises.
5. **Hazardous Substances.** Mortgagor shall not release, generate, store (except in full compliance with all applicable environmental laws) or dispose of any Hazardous Substances on the mortgaged premises or on any property adjacent to or surrounding the mortgaged premises. In the event that (except in full compliance with all applicable environmental laws) any Hazardous Substances is found on or in the mortgaged premises, Mortgagor shall immediately contain and remove the same in compliance with all state and federal Hazardous Substances laws. The Mortgagor hereby authorizes the Mortgagee and its agents, representatives, appraisers, engineers and other designees, upon reasonable notice, to visit and enter upon the mortgaged premises for purpose of inspecting and/or appraising the same and/or performing environmental site assessments and evaluations. The Mortgagor agrees to pay all reasonable expenses and charges incurred by the Mortgagee in connection with such visits, inspections, appraisals, site assessments and evaluations. Mortgagor agrees to indemnify and hold Mortgagee harmless from and against any and all claims, liabilities, costs and expenses incurred by Mortgagee, including, without limitation, costs of litigation and reasonable attorney's fees, arising from the release, existence or removal of, any Hazardous Substances on or in the mortgaged premises or on any properties adjacent to or surrounding the mortgaged premises. THIS RIGHT OF INDEMNIFICATION SHALL SURVIVE THE PAYMENT IN FULL OF THE DEBT INSTRUMENTS, NOTWITHSTANDING ANY DISCHARGE OF THIS MORTGAGE.
6. **Sales and Transfers.** Mortgagor shall not, directly or indirectly, sell, convey, mortgage, pledge, hypothecate, encumber, lease, assign or otherwise transfer the mortgaged premises or any part thereof or any interest therein (including, without limitation, the transfer of any ownership interest in any Mortgagor that is not an individual) without the prior written consent of Mortgagee. Mortgagee's consent to any sale may be based on, among other things, its determination, in its sole and uncontrolled discretion, as to the acceptability of the terms of sale and as to the creditworthiness, financial strength and competence to manage the mortgaged premises of the proposed purchaser, and the entry into an assumption agreement by the proposed purchaser in form and substance satisfactory to Mortgagee, in its sole and uncontrolled discretion, which agreement may provide for, among other things, an increase in the interest rate applicable to the Debt Instruments and/or other change in the terms thereof. Without limiting the generality of the foregoing, Mortgagor will not create, join or consent to any condominium declaration, private restrictive covenant or other restriction affecting the mortgaged premises or any part thereof, without the prior written consent of Mortgagee.
7. **Easements; Licenses; Etc.** Mortgagor, to the extent reasonably within its control, shall maintain, preserve and renew (a) any and all easements, rights of way, privileges and hereditaments now or hereafter belonging or inuring to the benefit of the mortgaged premises and/or improvements or any part thereof, and (b) any and all licenses. Without the prior consent of Mortgagee, Mortgagor will not initiate, create, join in or consent to any change of zoning with respect

to the mortgaged premises or any part thereof.

8. **Insurance.** Mortgagor shall keep all improvements situated on the mortgaged premises continuously insured against loss by fire and the risks covered under a so-called "extended coverage endorsement", flood, explosion of boilers, heating apparatus and other pressure vessels, and such other hazards, casualties and contingencies as Mortgagee from time to time reasonably may require, in an amount equal to one hundred percent (100%) of the replacement cost of such improvements. All such insurance shall be evidenced by valid and enforceable policies in form and substance satisfactory to Mortgagee. Without limiting the generality of the foregoing: (a) all such insurance policies shall contain an endorsement requiring twenty (20) days written notice to Mortgagee prior to cancellation or change in the coverage, scope or amount of any such policy or policies; and (b) any and all policies evidencing casualty insurance shall provide that any and all loss shall be payable to Mortgagee notwithstanding any act or omission of Mortgagor which might otherwise result in cancellation or forfeiture of said insurance. Mortgagee shall have the right, and Mortgagee is hereby made, constituted and appointed (with full power of substitution and revocation) the true and lawful attorney-in-fact irrevocable of Mortgagor, in the name, place and stead of Mortgagor, but in the sole and uncontrolled discretion of said attorney, (i) to demand, adjust, sue for, compromise and collect any amounts due under such insurance policies in the event of loss; and (ii) to give releases for any and all amounts received in settlement of losses under such policy; and the same shall, at Mortgagee's option, be applied, after first deducting the cost of collection, to the payment of the indebtedness secured hereby, whether or not then due, or to reimbursement of any taxes, assessments, charges, insurance premiums or other obligations paid by Mortgagee pursuant hereto, or, notwithstanding the claims of any subsequent lienor, the same may be used to pay over to Mortgagor for use in repairing or replacing damaged buildings and improvements on the subject property. The Mortgagee, at its sole option, shall have the right to elect whether (i) to retain some or all of such insurance proceeds and apply the same to the Obligations evidenced by the Debt Instruments or (ii) to release some or all of such insurance proceeds to the Mortgagor for repair and restoration of the mortgaged premises. If Mortgagee shall by any manner acquire title to the mortgaged premises, it shall thereupon become the sole and absolute owner of all insurance policies held by or required hereunder to be delivered to Mortgagee, with the sole right to collect and retain all unearned premiums and dividends thereon, and Mortgagor shall only be entitled to a credit, in reduction of the then outstanding indebtedness secured hereby, in the amount of the short rate cancellation refund. Without limiting the generality of the foregoing, in the event of foreclosure of this Mortgage or any transfer of title to the mortgaged premises to a third-party purchaser pursuant to the power(s) in this Mortgage granted Mortgagee, Mortgagee shall be and is hereby authorized and empowered, for and in the name or names and on behalf of Mortgagor and/or Mortgagee, and for the purposes hereinafter set forth, shall be and is hereby made, constituted and appointed the true and lawful attorney-in-fact irrevocable of Mortgagor (with full power of substitution and revocation) in the name, place and stead of Mortgagor, and in the sole and uncontrolled discretion of said attorney, to surrender up the policies of insurance covering the mortgaged premises and any part thereof and to collect any amounts due thereunder or, at its option, to transfer all right, title and interest in and to said policies and the proceeds thereof to any purchaser of the mortgaged premises or any part thereof without obligation to account therefor to any person claiming title to the mortgaged premises; provided, however, that any amounts received by Mortgagee under said policies by way of refunds, dividends or otherwise, as aforesaid, shall be applied to the payment of Mortgagor's obligations under the Debt Instruments, and any surplus shall be paid over as a surplus on foreclosure. The foregoing appointments being coupled with an interest are irrevocable.

9. **Owner Occupancy.** Mortgagor shall occupy, or shall cause an affiliate of Mortgagor to occupy, the Mortgaged Property until all Obligations are paid in full.

10. **Taxes and Assessments.** Mortgagor shall pay, when due, all taxes, assessments, and other charges, fines and impositions attributable to the mortgaged premises (the "Impositions") and shall furnish to Mortgagee, promptly after payment of the same, certificates, receipts or other evidence reasonably satisfactory to Mortgagee of such payment; provided; however, Mortgagor shall not be required to pay and discharge any such Imposition, if and so long as (a) the validity thereof shall be contested by Mortgagor with diligence and in good faith by appropriate proceedings and (b) Mortgagor shall have deposited with Mortgagee a sum equal to the amount being so contested and any additional charge, penalty or expense which may be incurred as a result of such contest; and provided further, however, that any such Imposition and any such additional charge, penalty or expense shall be paid in full and before the mortgaged premises, or any part thereof, shall be seized and sold in satisfaction thereof. Mortgagor shall pay, when the same shall become due and payable, all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in or permit the creation of a lien on the mortgaged premises or any part thereof; provided, however, Mortgagor shall not be required to pay any such claim or demand, if and so long as (a) the validity thereof shall be contested by Mortgagor with diligence and in good faith by appropriate proceedings and (b) in the event that such claim or demand results in a lien or notice of record against the mortgaged premises or any part thereof, Mortgagor shall have bonded or otherwise caused such lien to be removed or discharged. Mortgagor shall pay to Mortgagee, within thirty (30) days after Mortgagee's demand, an amount equal to any and all taxes, assessments or charges of whatever nature (other than taxes on the net income of Mortgagee) which may at any time be assessed against Mortgagee with respect to the mortgaged premises or its ownership or holding thereof, whether under statutes now or hereafter in effect. In the event any such tax, assessment or charge is not or, under applicable law, cannot be so paid by Mortgagor, at the option of Mortgagee, the Mortgagor's obligations under the Debt Instruments shall become immediately due and payable.

11. **Tax and Insurance Payments.** Mortgagee, at any time, upon ten (10) days notice to Mortgagor, may require Mortgagor to pay to Mortgagee, on the first day of each calendar month, a sum equal to (a) one-twelfth (1/12) of the annual Impositions and (b) one-twelfth (1/12) of the annual premiums for the insurance required hereunder to be maintained on the mortgaged premises, the respective amounts of such Impositions and premiums to be reasonably estimated from time to time by Mortgagee (the "Deposited Funds"). Mortgagee shall apply the Deposited Funds to the payment of such Impositions and premiums and shall render an annual accounting to Mortgagor of all disbursements of the Deposited Funds. Although each such monthly payment of Deposited Fund is to be in a lump sum, each component thereof shall be deemed to be held separately by Mortgagor for, and shall be applied only to, the

particular item for which payment was made by Mortgagor, unless Mortgagee, in its discretion, elects otherwise. If at any time Mortgagee estimates that there shall or will not be on deposit with it, at least one (1) month prior to the due date (a) of any item constituting part of the Impositions and/or (b) of any annual insurance premium, a sum sufficient for the payment of such item and/or premium in full, Mortgagor, upon demand, shall pay the amount of such deficiency to Mortgagee notwithstanding that there may already be deposited with Mortgagee sums for the payment of other items which are not yet due. If the amount of the Deposited Funds shall exceed the amount necessary to pay such Impositions and premiums for the then current year, such excess shall be credited against future monthly deposits required hereunder. Unless otherwise required by applicable law, no interest shall be paid on the Deposited Funds, and the Deposited Funds may be commingled with Mortgagee's general funds. Upon payment and other satisfaction in full of the obligations secured hereby, any excess Deposited Funds shall be refunded to Mortgagor. Upon the occurrence of any Event of Default, Mortgagee may apply against the obligations secured hereby, in such manner as Mortgagee may determine, any or all of the Deposited Funds then held by Mortgagee.

12. **Leases.** Mortgagor does hereby transfer, assign and deliver unto Mortgagee the Leases (which term shall be defined as each and every agreement providing for use or occupancy of all or any part of the mortgaged premises, whether written or oral, whether now existing or hereafter arising, and any and all amendments, renewals and extensions thereof), the Rents (which term shall be defined as any and all rents and other payments of every kind due or payable and to become due or payable to Mortgagor by virtue of the Leases, or otherwise due or payable and to become due or payable to Mortgagor as the result of any use, possession or occupancy of all or any part of the mortgaged premises) and all right, title and interest of Mortgagor in and to any and all guarantees of any of the Leases; TO HAVE AND TO HOLD the Leases, the Rents and any guarantees in connection therewith, together with all the rights, privileges and appurtenances now or hereafter in any wise belonging or pertaining thereto, unto Mortgagee, its successors and assigns, forever, subject, however, to the terms and conditions hereinafter provided in this Paragraph 11.

13. **Right of Mortgagee to Collect Rents.** Mortgagor hereby authorizes and empowers Mortgagee to collect the Rents as the same shall become due, and hereby irrevocably directs each and all of the Lessees (which term shall be defined as any tenant pursuant to a Lease) and sublessees to pay to Mortgagee, upon demand by Mortgagee, the rents as may now be due or payable and/or shall hereafter become due or payable; provided however, no such demand shall be made by Mortgagee unless and until there shall have occurred a Default or an Event of Default as such terms or similar terms are used in the Debt Instruments. Until such demand is made, Mortgagor shall have the license to collect or continue to collect the Rents; upon such demand such license shall cease.

**Prepayment of Rents.** Mortgagor's right to collect or to continue to collect the Rents as aforesaid, shall not authorize collection by Mortgagor of any installment of rent or any other payment (exclusive of security deposits) more than one (1) month in advance of the respective dates prescribed in the Leases or otherwise for the payment thereof without the written consent of Mortgagee; and

**Lessee Protection.** No Lessee, sublessee, tenants or other occupant of the mortgaged premises making any payment to Mortgagee pursuant to this Paragraph 11 shall be under any obligation to inquire into or determine the actual existence of any default claimed by Mortgagee.

13.1 **Power of Attorney.** Mortgagee shall be and hereby is authorized and empowered, for and in the name or names and on behalf of Mortgagor and/or Mortgagee, and for the purposes hereinafter set forth, shall be and hereby is made, constituted and appointed the true and lawful attorney-in-fact of Mortgagor (with full power of substitution and revocation) and in the name, place and stead of Mortgagor, and in the sole and uncontrolled discretion of said attorney, to cause the assignment to Mortgagee of any Lease which has not been so assigned after request therefor by Mortgagee. The foregoing appointment, being coupled with an interest, is irrevocable until the obligations under the Debt Instruments are paid and otherwise satisfied in full.

13.2 **Approval.** Mortgagor shall not enter into any Lease without first obtaining Mortgagee's written approval of the terms and conditions thereof and the Lessee thereunder.

13.3 **Rent Roll.** Mortgagor shall, upon Mortgagee's request, supply Mortgagee within five (5) days of such request, a "rent roll," so-called, stating with respect to each unit in the mortgaged premises the name of the tenant thereof, the rent paid by such tenant, the date to which such rent is paid, the date on which such tenant's leasehold interest terminates and the amount held by Mortgagor by way of security deposit from each such tenant; such rent rolls to be certified to as being accurate by Mortgagor.

13.4 **Remedies.** Mortgagee shall have the right forthwith, at its election, and without further notice or demand (except as otherwise specifically provided in this Mortgage or the other Debt Instruments) and without the commencement of any action to foreclose this Mortgage or the exercise of the power of sale Mortgagee has under this Mortgage, to enter immediately upon and take possession of the mortgaged premises, or any part thereof, without further consent or assignment by Mortgagor, and to do, execute and perform any act, deed, matter or thing whatsoever that ought to be done, executed and performed in and about or with respect to the mortgaged premises and the leasing, management, or operation thereof as fully as Mortgagor might do, including, without limitation, the right to institute summary proceedings against any Lessee who shall fail to comply with the provisions of the applicable Lease, with the right to lease the mortgaged premises, or any part thereof, and to collect and receive all of the Rents, issues and profits, and all other amounts past due or to become due to Mortgagor by reason of its ownership of the mortgaged premises and to apply the same, after the payment of all necessary charges and expenses in connection with the operation of the mortgaged premises (including, without limitation, any managing agent's commission, at the option of Mortgagee), on account of the obligations evidenced by the Debt Instruments. If Mortgagor or any other person claiming by, through or under it, (other than any Lessee whose tenancy Mortgagee has agreed in writing not to disturb or whose tenancy Mortgagee, in its sole and uncontrolled discretion, is willing not to disturb) are occupying all or any part of the mortgaged premises, it is hereby agreed that Mortgagor and such other persons shall either immediately surrender possession of the mortgaged premises to Mortgagee and vacate the premises so occupied or pay a reasonable rental for the use thereof, monthly in advance, to Mortgagee. Mortgagee shall also be entitled to have a receiver appointed to enter and take possession of the mortgaged premises, exercise the other rights and remedies available to the Mortgagee hereunder, collect the Rents and apply the same as the court may direct. Mortgagor

also agrees that Mortgagee's legal remedies are inadequate and that Mortgagee shall be entitled to obtain equitable relief.

14. **Incorporation of Statutory Provisions.** This Mortgage is upon the condition that all covenants of Mortgagor contained in this Mortgage and in the Debt Instruments shall be kept and performed, and for any breach of said condition , Mortgagee shall have the right to foreclose this Mortgage under any legal method of foreclosure in existence at the time under any applicable law including, without limitation, the STATUTORY POWER OF SALE, which is expressly incorporated herein by reference, to the extent authorized or allowed by any present or future law of theState of Rhode Island and in connection therewith, the Mortgagor stipulates that this Mortgage secures a loan or loans primarily for business and commercial purposes. No remedy herein conferred on the Mortgagee is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing. Said STATUTORY POWER OF SALE, as well as the MORTGAGE COVENANTS contained in the granting clause of this Mortgage, are those contained in the State of Rhode Island Revised Statutes. Mortgagor agrees for itself, its successors and assigns, that the acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of this Mortgage, of insurance proceeds, eminent domain awards, Rents or anything else of value to be applied on or to the obligations secured hereby by Mortgagee or any person or party holding under Mortgagee shall not constitute a waiver of such foreclosure. This agreement by Mortgagor is intended to apply to the acceptance and such application of any such proceeds, awards, Rents and other sums of anything else of value, whether the same shall be accepted from, or for the account of, Mortgagor or from any other source whatsoever by Mortgagee or by any person or party holding under Mortgagee at any time or times..
15. **Surrender of Possession.** In the event of any sale of the mortgaged premises under the provisions hereof, Mortgagor shall forthwith surrender possession thereof to the purchaser. Upon failure to do so, Mortgagor shall thereupon be a tenant at sufferance of such purchaser, and upon its failure to surrender possession of the mortgaged premises upon demand, such purchaser, his heirs, legal representatives, successors or assigns, shall be entitled to institute and maintain an appropriate action for possession of the mortgaged premises.
16. **Successors and Assigns.** This Mortgage shall be binding upon Mortgagor and the heirs, executors, administrators, successors and assigns of the Mortgagor and shall inure to the benefit of Mortgagee and successors and assigns of the Mortgagee, as if all such parties were all herein mentioned whenever the parties hereto are referred to. Wherever the words Mortgagor and Mortgagee are used herein they shall include their several successors, grantees and assigns, subject to the limitations of law and of this instrument.
17. **Effect of Conveyance.** In the event the ownership of the mortgaged premises, or any part thereof, becomes vested in a person or entity other than Mortgagor, Mortgagee may, without notice to Mortgagor, deal with such successor or successors in interest with reference to the mortgage and the debt hereby secured, in the same manner as with Mortgagor, without in any way vitiating or discharging Mortgagor's liability hereunder or upon the debt hereby secured. No sale of the premises hereby mortgaged and no forbearance on the part of Mortgagee and no extension of the time for the payment of the debt hereby secured given by Mortgagee shall operate to release, discharge, modify, change or affect the original liability of Mortgagor herein, either in whole or in part.
18. **Future Advances.** This Mortgage permits and secures any and all current and future advances to Mortgagor evidenced by such note or notes as may be signed by Mortgagor payable to Mortgagee and/or pursuant to such agreements as may be entered into by Mortgagor with Mortgagee.. The unpaid principal balance of indebtedness outstanding and secured by this Mortgage shall at no time exceed the principal sum of Four Hundred Seventy-Six Thousand and No/100 Dollars ($476,000.00) ("Maximum Unpaid Principal Balance Secured").
19. **Descriptive Headings; Context.** The captions in this Mortgage are for convenience of reference only and shall not define or limit any provision. Whenever the context so requires, reference in this Mortgage to the neuter gender shall include the masculine and/or feminine gender, and the singular number shall include the plural, and, in each case, vice versa.
20. **Changes to Mortgage.** Mortgagor and Mortgagee may agree to change the interest rate and/or the maturity date of the Debt Instruments or other terms of this Mortgage or of the obligations secured by this Mortgage.

**Receipt Of Mortgage.** Mortgagor hereby declares that the Mortgagor has read this Mortgage, has received a completely filled in copy of it, without charge therefor, and has signed this Mortgage as of the date shown on the top of the first page.

IN WITNESS WHEREOF, Mortgagor has executed and delivered this Mortgage Deed as of 6-12-07.

WITNESS:

[signature]
Witness:
Marc A. Soucy

ATLANTIS MANAGEMENT, LLC

By: [signature]
Name: TAREK WEHBE
Title: Member

EXHIBIT "A"

That certain parcel of land situated in the City of Providence, State of Rhode Island, bounded and described as follows:

Beginning at a point in the relocated westerly line of North Main Street at the northeast corner of the tract herein described, said point being in the southerly line of land of the City of Providence, fourteen and one hundredths (14.01) feet westerly as measured along the southerly line of said City of Providence land from the present westerly line of North Main Street;

Thence running S 22° - 35' 13" W, bounded southeasterly by the relocated North Main Street, a distance of forty-seven and twenty hundredths (47.20) feet to a point of curvature;

Thence along the arc of a circle curving to the right having a radius of twenty (20.00) feet and a central angle of 73°-58'-19" bounded generally southeasterly on the relocated intersection of North Main Street and Livingston Street, a distance of twenty-five and eighty-two hundredths (25.82) feet to a point of tangency in the northerly line of Livingston Street;

Thence running N 83°-26'-28" W, bounded southerly by Livingston Street, a distance of eighty-eight and fifty hundredths (88.50) feet to a point of curvature;

Thence along the arc of a circle curbing to the right having a radius of fifteen (15.00) feet and a central angle of 68°-36'-01" bounded generally southwesterly on the relocated intersection of Livingston Street and Mechanics Avenue, a distance of seventeen and ninety-six hundredths (17.96) feet to a point of tangency, in the easterly line of Mechanics Avenue;

Thence running N 14°-50'-27" W, bounded southwesterly by Mechanics Avenue, a distance of one hundred fifty-two and forty-five hundredths (152.45) feet to a corner;

Thence turning an interior angle of 76°-30'-54" and running N 88°-38'-39" E, bounded northerly by land now or formerly of the Providence Redevelopment Agency, a distance of sixty-one and six hundredths (61.06) feet to land of the City of Providence;

Thence turning an interior angle of 86°-33'-20" and running S 2°-05'-19" W, bounded easterly by land of the City of Providence, a distance of seventy-eight and eighty-four hundredths (78.84) feet to a corner;

Thence turning an interior angle of 255°-42'-20" and running S 73°-37'-01" E, bounded northeasterly by land of the City of Providence, a distance of one hundred twenty-five and fifty-six hundredths (125.56) feet to the point and place of beginning.

The first and last courses forming an interior angle of 83°-47'-46" and said parcel contains thirteen thousand eight hundred fourteen (13,814) square feet of land.

Together with rights of passage of record.

Subject to Restrictions and Terms & Provisions of record in Book 1163 Page 1097.
Subject to Restrictions of record in Book 1174 Page 1055 and Book 3856 Page 125.
Subject to Easements of record in Book 1163 Page 1097 and Book 1163 Page 1110; Corrective Easement of record in Book 1174 Page 1055.

PROPERTY ADDRESS: 790 North Main Street
Providence, RI 02904

# EXHIBIT D: January 19, 2006
# Note and Agreement

Bank of America

# Note and Agreement

Date of Agreement: January 19, 2006

**Bank of America, N.A.**
Business Credit Services - Documentation & Servicing
Premier Banking/Small Business Banking
West Seneca - Attn: Notice Desk
NY7-505-01-24
2970 Transit Rd
West Seneca, NY 14224

Primary Borrower Name(s) and Address
**Atlantis Management, llc**
**5 Princess Pine Road**
**Lincoln, RI 02865**

| Principal Amount: | $288,285.56 | Account Number: | 1385673 |
|---|---|---|---|

**Introduction.** This Note and Agreement ("Agreement"), dated and effective as of January 19, 2006, is entered into between Atlantis Management, llc (the "Borrower") and Bank of America, N.A. (the "Bank"). The Borrower agrees to the following terms and conditions:

1. LOAN

1.1 **Loan Amount.** The Bank agrees to provide a term loan to the Borrower in the amount of Two Hundred Eighty-Eight Thousand Two Hundred Eighty-Five and 56/100 Dollars ($288,285.56) (the "Commitment").

1.2 **Availability Period.** The loan is available in one disbursement from the Bank on the date of this Agreement.

1.3 **Repayment Terms.**

(a) The Borrower will pay interest on February 1, 2006, and then on the same day of each month thereafter until payment in full of any principal outstanding under this Agreement.

(b) The Borrower will repay principal installments beginning on February 1, 2006, and on the same day of each month thereafter, and ending on February 1, 2012 (the "Repayment Period"). Each principal installment shall be in an amount sufficient to fully amortize the principal amount over an amortization period of twenty (20) years. See attached amortization schedule. In any event, on the last day of the Repayment Period, the Borrower will repay the remaining principal balance plus any interest then due.

(c) The Borrower may prepay principal in full or in part at any time without the payment of a prepayment fee or premium. The prepayment will be applied to the most remote payment of principal due under this Agreement.

1.4 **Interest Rate.**

(a) The interest rate is a rate per year equal to the BBA LIBOR Adjusted Periodically Rate plus 1.25 percentage point(s).

(b) The interest rate will be adjusted on the 1st of every month (the "Adjustment Date") and remain fixed until the next Adjustment Date. If the Adjustment Date in any particular month would otherwise fall on a day that is not a

banking day then, at the Bank's option, the Adjustment Date for that particular month will be the first banking day immediately following thereafter.

(c) The BBA LIBOR Rate (Adjusted Periodically) is a rate of interest equal to the rate per annum (rounded upwards to the nearest 1/100 of one percent) equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by the Bank from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days prior to the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month, as adjusted from time to time in the Bank's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by the Bank. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars.

**2. FEES AND EXPENSES**

**2.1 Fees.**

(a) Waiver Fee. If the Bank, at its discretion, agrees to waive or amend any terms of this Agreement, the Borrower will, at the Bank's option, pay the Bank a fee for each waiver or amendment in an amount advised by the Bank at the time the Borrower requests the waiver or amendment. Nothing in this paragraph shall imply that the Bank is obligated to agree to any waiver or amendment requested by the Borrower. The Bank may impose additional requirements as a condition to any waiver or amendment.

(b) Late Fee. To the extent permitted by law, the Borrower agrees to pay a late fee in an amount not to exceed four percent (4%) of any payment that is more than fifteen (15) days late. The imposition and payment of a late fee shall not constitute a waiver of the Bank's rights with respect to the default.

**2.2 Expenses.** The Borrower agrees to immediately repay the Bank for expenses that include, but are not limited to, filing, recording and search fees, appraisal fees, title report fees, documentation fees, and all fees and taxes required by law in connection with providing the credit.

**2.3 Reimbursement Costs.** The Borrower agrees to reimburse the Bank for the cost of periodic field examinations of Borrower's books, records and collateral, and appraisals of the collateral, at such intervals as the Bank may reasonably require. The actions described in this paragraph may be performed by employees of the Bank or by independent appraisers.

**3. COLLATERAL**

3.1 Real Property – Parcel #1.

(a) The Borrower's obligations to the Bank under this Agreement will be secured by a lien covering the following real property owned by the Borrower:

790 North Main Street
Providence, RI 02865

The Bank's lien may be junior to the existing first lien on the real property.

**4. DISBURSEMENTS, PAYMENTS AND COSTS**

**4.1 Direct Debit (Pre-Billing).**

(a) The Borrower agrees that the Bank will debit deposit account number 9418115463 owned by the Borrower, or such other of the Borrower's accounts with the Bank as designated in writing by the Borrower (the "Designated Account") on the date each payment of principal and interest and any fees from the Borrower becomes due (the "Due Date").

(b) Prior to each Due Date, the Bank will mail to the Borrower a statement of the amounts that will be due on that Due Date (the "Billed Amount"). The bill will be mailed a specified number of calendar days prior to the Due Date, which number of days will be mutually agreed from time to time by the Bank and the Borrower. The calculations in the bill will be made on the assumption that no new extensions of credit or payments will be made between the date of the billing statement and the Due Date, and that there will be no changes in the applicable interest rate.

(c) The Bank will debit the Designated Account for the Billed Amount, regardless of the actual amount due on that date (the "Accrued Amount"). If the Billed Amount debited to the Designated Account differs from the Accrued Amount, the discrepancy will be treated as follows:

(i) If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the discrepancy. The Borrower will not be in default by reason of any such discrepancy.

(ii) If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the discrepancy.

Regardless of any such discrepancy, interest will continue to accrue based on the actual amount of principal outstanding without compounding. The Bank will not pay the Borrower interest on any overpayment.

(d) The Borrower will maintain sufficient funds in the Designated Account to cover each debit. If there are insufficient funds in the Designated Account on the date the Bank enters any debit authorized by this Agreement, the Bank may reverse the debit.

(e) The Borrower may terminate this direct debit arrangement at any time by sending written notice to the Bank. If the Borrower terminates this arrangement, then the principal amount outstanding under this Agreement will at the option of the Bank bear interest at a rate per annum which is one (1.0) percentage point higher than the rate of interest otherwise provided under this Agreement and the amount of each payment will be increased accordingly.

**4.2 Banking Days.** Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in the state where the Bank's lending office is located, and, if such day relates to amounts bearing interest at an offshore rate (if any), means any such day on which dealings in dollar deposits are conducted among banks in the offshore dollar interbank market. Although the Bank's banking centers in Rhode Island are closed on V-J Day, that date will be considered a banking day under this Agreement. All payments and disbursements which would be due on a day which is not a banking day will be due on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

**4.3 Interest Calculation.** Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 360-day year and the actual number of days elapsed. This results in more interest or a higher fee than if a 365-day year is used. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

**4.4 Default Rate.** Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any interest, fees, or costs which are not paid when due, will at the option of the Bank bear interest at a rate which is 6.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

## 5. CONDITIONS

Before the Bank is required to extend any credit to the Borrower under this Agreement, it must receive any documents and other items it may reasonably require, in form and content acceptable to the Bank, including any items specifically listed below.

**5.1 Authorizations.** If the Borrower or any guarantor is anything other than a natural person, evidence that the execution, delivery and performance by the Borrower and/or such guarantor of this Agreement and any instrument or agreement required under this Agreement have been duly authorized.

**5.2 Governing Documents.** If required by the Bank, a copy of the Borrower's organizational documents.

5.3 **Guaranties.** Guaranties signed by Renaissance Medical Group, Inc. and Tarek Wehbe.

5.4 **Perfection and Evidence of Priority.** Evidence that the security interests and liens in favor of the Bank are valid, enforceable, properly perfected in a manner acceptable to the Bank and prior to all others' rights and interests, except those the Bank consents to in writing. All title documents for motor vehicles which are part of the collateral must show the Bank's interest.

5.5 **Payment of Fees.** Payment of all fees, expenses and other amounts due and owing to the Bank. If any fee is not paid in cash, the Bank may, in its discretion, treat the fee as a principal advance under this Agreement or deduct the fee from the loan proceeds.

5.6 **Mortgage.** Signed and acknowledged original mortgage, as required by the Bank, encumbering the real property collateral.

5.7 **Title Insurance.** An ALTA lender's title insurance policy (1992 form) from a title company acceptable to the Bank, for at least Two Hundred Eighty-Eight Thousand Two Hundred Eighty-Five and 56/100 Dollars ($288,285.56), insuring the Bank's interest in the real property collateral, with only such exceptions as may be approved by the Bank.

5.8 **Environmental Information.** A completed Bank form Environmental Questionnaire.

6. **REPRESENTATIONS AND WARRANTIES**

When the Borrower signs this Agreement, and until the Bank is repaid in full, the Borrower makes the following representations and warranties. Each request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request:

6.1 **Formation.** If the Borrower is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

6.2 **Authorization.** This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

6.3 **Good Standing.** In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

6.4 **Financial Information.** All financial and other information that has been or will be supplied to the Bank is sufficiently complete to give the Bank accurate knowledge of the Borrower's (and any guarantor's) financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower (or any guarantor). If the Borrower is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

6.5 **Lawsuits.** There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would impair the Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Bank.

6.6 **Other Obligations.** The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Bank.

6.7 **Tax Matters.** The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Bank.

6.8 **No Event of Default.** There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement.

6.9 **Collateral.** All collateral required in this Agreement is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Bank in writing.

## 7. COVENANTS

The Borrower agrees, so long as credit is available under this Agreement and until the Bank is repaid in full:

7.1 **Use of Proceeds.** To use the proceeds of the credit only for business purposes.

7.2 **Financial Information.** To provide financial statements and other information in form and content acceptable to the Bank relating to the affairs of the Borrower and any guarantor as requested by the Bank from time to time.

(a) Copies of the federal income tax return of the Borrower, Renaissance Medical Group, Inc. and Tarek Wehbe, within 45 days of filing, and, if requested by the Bank, copies of any extensions of the filing date.

(b) Self-prepared personal financial statement on all guarantors.

7.3 **Other Debts.** Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Bank), or become liable for the liabilities of others, without the Bank's written consent. This does not prohibit:

(a) Acquiring goods, supplies, or merchandise on normal trade credit.

(b) Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Bank.

(c) If the Borrower is a natural person, additional debts of the Borrower as an individual for consumer purposes.

7.4 **Other Liens.** Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a) Liens and security interests in favor of the Bank.

(b) Liens for taxes not yet due.

(c) Liens outstanding on the date of this Agreement disclosed in writing to the Bank.

7.5 **Maintenance of Assets.**

(a) Not to sell, assign, lease, transfer or otherwise dispose of any part of the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b) Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c) Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d) To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e) To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

7.6 **Loans.** Not to make any loans, advances or other extensions of credit to any individual or entity except for extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

7.7 **Change of Management.** Not to make any substantial change in the present executive or management personnel of the Borrower.

7.8 **Change of Ownership.** If the Borrower is anything other than a natural person, not to cause, permit, or suffer any change in capital ownership such that there is a material change, as determined by the Bank in its sole discretion, in the direct or indirect capital ownership of the Borrower.

7.9 **Additional Negative Covenants.** Not to, without the Bank's written consent:

(a) Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b) Acquire or purchase a business or its assets.

(c) Engage in any business activities substantially different from the Borrower's present business.

(d) Liquidate or dissolve the Borrower's business.

7.10 **Notices to Bank.** To promptly notify the Bank in writing of:

(a) Any event of default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an event of default.

(b) Any change in the Borrower's name, legal structure, place of business, or chief executive office if the Borrower has more than one place of business.

7.11 **Insurance**

(a) General Business Insurance. To maintain insurance as is usual for the business it is in.

(b) Insurance Covering Collateral. To maintain all risk property damage insurance policies covering the tangible property comprising the collateral. Each insurance policy must be for the full replacement cost of the collateral and include a replacement cost endorsement. The insurance must be issued by an insurance company acceptable to the Bank and must include a lender's loss payable endorsement in favor of the Bank in a form acceptable to the Bank.

(c) Evidence of Insurance. Upon the request of the Bank, to deliver to the Bank a copy of each insurance policy, or, if permitted by the Bank, a certificate of insurance listing all insurance in force.

7.12 **Compliance with Laws.** To comply with the laws (including any fictitious or trade name statute), regulations, and orders of any government body with authority over the Borrower's business.

7.13 **Books and Records.** To maintain adequate books and records.

7.14 **Audits.** To allow the Bank and its agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records are in the possession of a third party, the Borrower authorizes that third party to permit the Bank or its agents to have access to perform inspections or audits and to respond to the Bank's requests for information concerning such properties, books and records.

7.15 **Perfection of Liens.** To help the Bank perfect and protect its security interests and liens, and reimburse it for related costs it incurs to protect its security interests and liens.

7.16 **Cooperation.** To take any action reasonably requested by the Bank to carry out the intent of this Agreement.

7.17 **Bank as Principal Depository.** To maintain, and to cause each guarantor to maintain, the Bank as its principal depository bank, including for the maintenance of business, cash management, operating and administrative deposit accounts.

7.18 **Flood and Other Insurance.** If any improved real property collateral is located in a designated flood hazard area, or becomes located in a designated flood hazard area after the date of this Agreement as a result of any re-mapping of flood insurance maps by the Federal Emergency Management Agency, the Borrower will be required to maintain flood insurance on the real property and on any tangible personal property collateral located on the real property. In addition, the Borrower shall maintain such other insurance as the Bank may require to comply with the Bank's regular requirements and practices in similar transactions, which may include earthquake insurance and insurance covering acts of terrorism.

7.19 **Inspections and Appraisals of Real Property.** To allow the Bank and its agents to visit the real property collateral at any reasonable time for the purpose of inspecting the real property and conducting appraisals, and deliver to the Bank any financial or other information concerning the real property as the Bank may request.

**7.20 Indemnity Regarding Use of Real Property.** To indemnify, defend with counsel acceptable to the Bank, and hold the Bank harmless from and against all liabilities, claims, actions, damages, costs and expenses (including all legal fees and expenses of Bank's counsel) arising out of or resulting from the construction of any improvements on the real property collateral, or the ownership, operation, or use of the real property collateral, whether such claims are based on theories of derivative liability, comparative negligence or otherwise. The Borrower's obligations to the Bank under this Paragraph shall survive termination of this Agreement and repayment of the Borrower's obligations to the Bank under this Agreement, and shall also survive as unsecured obligations after any acquisition by the Bank of the real property collateral or any part of it by foreclosure or any other means.

## 8. HAZARDOUS SUBSTANCES

**8.1 Indemnity Regarding Hazardous Substances.** The Borrower agrees to indemnify and hold the Bank harmless from and against all liabilities, claims, actions, foreseeable and unforeseeable consequential damages, costs and expenses (including sums paid in settlement of claims and all consultant, expert and legal fees and expenses of the Bank's counsel) or loss directly or indirectly arising out of or resulting from any of the following:

(a) Any hazardous substance being present at any time, whether before, during or after any construction, in or around any part of the real property collateral securing this Agreement (the "Real Property"), or in the soil, groundwater or soil vapor on or under the Real Property, including those incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work, or any resulting damages or injuries to the person or property of any third parties or to any natural resources.

(b) Any use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about any of the Borrower's property or operations or property leased to the Borrower, whether or not the property has been taken by the Bank as collateral.

Upon demand by the Bank, the Borrower will defend any investigation, action or proceeding alleging the presence of any hazardous substance in any such location, which affects the Real Property or which is brought or commenced against the Bank, whether alone or together with the Borrower or any other person, all at the Borrower's own cost and by counsel to be approved by the Bank in the exercise of its reasonable judgment. In the alternative, the Bank may elect to conduct its own defense at the expense of the Borrower. The Borrower's obligations to the Bank under this Article, except the obligation to give notices to the Bank, shall survive termination of this Agreement, repayment of the Borrower's obligations to the Bank under this Agreement, and foreclosure of the deed of trust or mortgage encumbering the Real Property or similar proceedings.

**8.2 Representation and Warranty Regarding Hazardous Substances.** Before signing this Agreement, the Borrower researched and inquired into the previous uses and ownership of the Real Property. Based on that due diligence, the Borrower represents and warrants that to the best of its knowledge, no hazardous substance has been disposed of or released or otherwise exists in, on, under or onto the Real Property, except as the Borrower has disclosed to the Bank in writing.

**8.3 Compliance Regarding Hazardous Substances.** The Borrower has complied, and will comply and cause all occupants of the Real Property to comply, with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws"). The Borrower shall promptly, at the Borrower's sole cost and expense, take all reasonable actions with respect to any hazardous substances or other environmental condition at, on, or under the Real Property necessary to (i) comply with all applicable Environmental Laws; (ii) allow continued use, occupation or operation of the Real Property; or (iii) maintain the fair market value of the Real Property. The Borrower acknowledges that hazardous substances may permanently and materially impair the value and use of the Real Property.

**8.4 Notices Regarding Hazardous Substances.** Until full repayment of the loan, the Borrower will promptly notify the Bank in writing if it knows, suspects or believes there may be any hazardous substance in or around the Real Property, or in the soil, groundwater or soil vapor on or under the Real Property, or that the Borrower or the Real Property may be subject to any threatened or pending investigation by any governmental agency under any current or future law, regulation or ordinance pertaining to any hazardous substance.

**8.5 Site Visits, Observations and Testing.** The Bank and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to the Borrower, to enter and visit the Real Property and any other locations where any personal property collateral securing this Agreement is located, for the purposes of observing the Real Property and the personal property collateral, taking and removing environmental samples, and conducting tests on any part of the Real Property. The Borrower shall reimburse the Bank on demand for the costs of any such environmental investigation and testing. The Bank will make reasonable efforts during any site visit, observation or testing conducted pursuant this paragraph to avoid interfering with the Borrower's use of the Real Property and the personal property collateral. The Bank is under no duty, however, to visit or observe the Real Property or the personal property collateral or to conduct tests, and any such acts by the Bank will be solely for the purposes of protecting the Bank's security and preserving the Bank's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") (i) will result in a waiver of any default of the Borrower; (ii) impose any liability on the Bank; or (iii) be a representation or warranty of any kind regarding the Real Property or the personal property collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event the Bank has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to the Borrower or any other party, the Borrower authorizes the Bank to make such a disclosure. The Bank may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in the Bank's judgment. The Borrower further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to the Borrower by the Bank or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of the Borrower) by the Borrower without advice or assistance from the Bank.

**8.6 Definition of Hazardous Substance.** "Hazardous substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

## 9. DEFAULT AND REMEDIES

If any of the following events of default occurs, the Bank may do one or more of the following without prior notice: declare the Borrower in default, stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately. If an event which, with notice or the passage of time, will constitute an event of default has occurred and is continuing, the Bank has no obligation to make advances or extend additional credit under this Agreement. In addition, if any event of default occurs, the Bank shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. If an event of default occurs under the paragraph entitled "Bankruptcy," below, with respect to the Borrower, then the entire debt outstanding under this Agreement will automatically be due immediately.

**9.1 Failure to Pay.** The Borrower fails to make a payment under this Agreement when due.

**9.2 Other Bank Agreements.** Any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank. For purposes of this Agreement, "Obligor" shall mean any guarantor, any party pledging collateral to the Bank, or, if the Borrower is comprised of the trustees of a trust, any trustor.

**9.3 Cross-default.** Any default occurs under any agreement in connection with any credit the Borrower (or any Obligor) has obtained from anyone else or which the Borrower (or any Obligor) or any of the Borrower's related entities or affiliates has guaranteed.

**9.4 False Information.** The Borrower or any Obligor has given the Bank false or misleading information or representations.

**9.5 Bankruptcy.** The Borrower, any Obligor, or any general partner of the Borrower or of any Obligor files a bankruptcy petition, a bankruptcy petition is filed against any of the foregoing parties, or the Borrower, any Obligor, or any general partner of the Borrower or of any Obligor makes a general assignment for the benefit of creditors.

**9.6 Receivers.** A receiver or similar official is appointed for any portion of the Borrower's or any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

**9.7 Revocation or Termination.** If the Borrower is comprised of the trustee(s) of a trust, the trust is revoked or otherwise terminated or all or a substantial part of the Borrower's assets are distributed or otherwise disposed of.

**9.8 Lien Priority.** The Bank fails to have an enforceable first lien (except for any prior liens to which the Bank has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

**9.9 Judgments.** Any judgments or arbitration awards are entered against the Borrower or any Obligor.

**9.10 Death.** If the Borrower or any Obligor is a natural person, the Borrower or such Obligor dies or becomes legally incompetent; if the Borrower or any Obligor is a trust, a trustor dies or becomes legally incompetent; if the Borrower or any Obligor is a partnership, any general partner dies or becomes legally incompetent; or if the Borrower is a corporation, any principal officer or majority stockholder dies.

**9.11 Material Adverse Change.** A material adverse change occurs, or is reasonably likely to occur, in the Borrower's (or any Obligor's) business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit.

**9.12 Government Action.** Any government authority takes action that the Bank believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay.

**9.13 Default under Related Documents.** Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any guarantor purports to revoke or disavow the guaranty.

**9.14 Other Breach Under Agreement.** A default occurs under any other term or condition of this Agreement not specifically referred to in this Article.

**10. ENFORCING THIS AGREEMENT; MISCELLANEOUS**

**10.1 GAAP.** Except as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank.

**10.2 Governing Law.** This Agreement is governed by Rhode Island law.

**10.3 Successors and Assigns.** This Agreement is binding on the Borrower's and the Bank's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Bank's prior consent.

**10.4 Arbitration and Waiver of Jury Trial**

(a) This paragraph concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this agreement (including any renewals, extensions or modifications); or (ii) any document related to this agreement (collectively a "Claim"). For the purposes of this arbitration provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this agreement.

(b) At the request of any party to this agreement, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this agreement provides that it is governed by the law of a specified state. The arbitration will take place on an individual basis without resort to any form of class action.

(c) Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this paragraph. In the event of any inconsistency, the terms of this paragraph shall control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, any party to this agreement may substitute another arbitration organization with similar procedures to serve as the provider of arbitration.

(d) The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this agreement. All Claims shall be determined by one arbitrator;

however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed, judgment entered and enforced.

(e) The arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of the statute of limitations, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s). The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this agreement.

(f) This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) **BY AGREEING TO BINDING ARBITRATION, THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM. FURTHERMORE, WITHOUT INTENDING IN ANY WAY TO LIMIT THIS AGREEMENT TO ARBITRATE, TO THE EXTENT ANY CLAIM IS NOT ARBITRATED, THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF SUCH CLAIM. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

**10.5 Severability; Waivers.** If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Bank retains all rights, even if it makes a loan after default. If the Bank waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

**10.6 Attorneys' Fees.** The Borrower shall reimburse the Bank for any reasonable costs and attorneys' fees incurred by the Bank in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Bank is entitled to recover costs and reasonable attorneys' fees incurred by the Bank related to the preservation, protection, or enforcement of any rights of the Bank in such a case. To the extent permitted by law, as used in this paragraph, "attorneys' fees" includes the allocated costs of the Bank's in-house counsel.

**10.7 Individual Liability.** If the Borrower is a natural person, the Bank may proceed against the Borrower's business and non-business property in enforcing this and other agreements relating to this loan. If the Borrower is a partnership, the Bank may proceed against the business and non-business property of each general partner of the Borrower in enforcing this and other agreements relating to this loan.

**10.8 Joint and Several Liability.** If two or more Borrowers sign this Agreement, each Borrower agrees that it is jointly and severally liable to the Bank for the payment of all obligations arising under this Agreement, and that such liability is independent of the obligations of the other Borrowers.

**10.9 One Agreement.** This Agreement and any related security or other agreements required by this Agreement, collectively:

(a) represent the sum of the understandings and agreements between the Bank and the Borrower concerning this credit;

(b) replace any prior oral or written agreements between the Bank and the Borrower concerning this credit; and

(c) are intended by the Bank and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**10.10 Indemnification.** The Borrower will indemnify and hold the Bank harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Bank to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Bank, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys, and assigns. This indemnity will survive repayment of the Borrower's obligations to the Bank. All sums due to the Bank hereunder shall be obligations of the Borrower, due and payable immediately without demand.

**10.11 Notices.** Unless otherwise provided in this Agreement or in another agreement between the Bank and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier. Notices to the Bank shall be sent to the address shown on the Borrower's latest billing statement. Notices to the Borrower shall be sent to the Borrower's address in the Bank's records. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

**10.12 Headings.** Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

**10.13 Counterparts.** This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

**10.14 Information Verification.** The Borrower authorizes the Bank at any time to verify or check any information given by the Borrower to the Bank, check the Borrower's credit references, verify employment, and receive from and give information to credit reporting agencies.

This Agreement is executed as of the date stated at the top of the first page.

Bank:

Bank of America, N.A.

By: [signature] SVP
Steven Lacroix, Senior Vice President

Borrower:

Atlantis Management, llc

By: [signature], Member
Tarek Wehbe, Member

**AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Borrower's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies ("Bank of America Affiliates"). The Bank may also share information contained in any applications and information it may obtain about the Borrower from outside sources with the Bank of America Affiliates, provided if the Borrower is an individual the Borrower may instruct the Bank that the Borrower prefers that the Bank not share this information with the Bank of America Affiliates by (1) calling the Bank at 1.888.341.5000; (2) sending an email through Contact Us at www.bankofamerica.com; or (3) contacting the Borrower's relationship manager or local banking center. To help the Bank complete the Borrower's request, the Borrower should include the Borrower's name, address, phone number, account number(s) and social security number. If the Borrower makes this election, certain products or services may not be made available to the Borrower. This request will apply to information from applications, consumer reports and other outside sources only, and may take six to eight weeks to be fully effective. Through the normal course of doing business, including servicing the Borrower's accounts and better serving the Borrower's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among Bank of America Affiliates.

| Start Date | End Date | Notional | Principal Payment |
|---|---|---|---|
| 01/03/06 | 02/01/06 | 288,285.56 | 757.20 |
| 02/01/06 | 03/01/06 | 287,528.36 | 811.96 |
| 03/01/06 | 04/03/06 | 286,716.40 | 811.96 |
| 04/03/06 | 05/01/06 | 285,904.44 | 811.96 |
| 05/01/06 | 06/01/06 | 285,092.48 | 811.96 |
| 06/01/06 | 07/03/06 | 284,280.52 | 811.96 |
| 07/03/06 | 08/01/06 | 283,468.56 | 811.96 |
| 08/01/06 | 09/01/06 | 282,656.60 | 811.96 |
| 09/01/06 | 10/02/06 | 281,844.64 | 811.96 |
| 10/02/06 | 11/01/06 | 281,032.68 | 811.96 |
| 11/01/06 | 12/01/06 | 280,220.72 | 811.96 |
| 12/01/06 | 01/02/07 | 279,408.76 | 811.96 |
| 01/02/07 | 02/01/07 | 278,596.80 | 811.96 |
| 02/01/07 | 03/01/07 | 277,784.84 | 866.41 |
| 03/01/07 | 04/02/07 | 276,918.43 | 866.41 |
| 04/02/07 | 05/01/07 | 276,052.02 | 866.41 |
| 05/01/07 | 06/01/07 | 275,185.61 | 866.41 |
| 06/01/07 | 07/02/07 | 274,319.20 | 866.41 |
| 07/02/07 | 08/01/07 | 273,452.79 | 866.41 |
| 08/01/07 | 09/04/07 | 272,586.38 | 866.41 |
| 09/04/07 | 10/01/07 | 271,719.97 | 866.41 |
| 10/01/07 | 11/01/07 | 270,853.56 | 866.41 |
| 11/01/07 | 12/03/07 | 269,987.15 | 866.41 |
| 12/03/07 | 01/02/08 | 269,120.74 | 866.41 |
| 01/02/08 | 02/01/08 | 268,254.33 | 866.41 |
| 02/01/08 | 03/03/08 | 267,387.92 | 925.30 |
| 03/03/08 | 04/01/08 | 266,462.62 | 925.30 |
| 04/01/08 | 05/01/08 | 265,537.32 | 925.30 |
| 05/01/08 | 06/02/08 | 264,612.02 | 925.30 |
| 06/02/08 | 07/01/08 | 263,686.72 | 925.30 |
| 07/01/08 | 08/01/08 | 262,761.42 | 925.30 |
| 08/01/08 | 09/02/08 | 261,836.12 | 925.30 |
| 09/02/08 | 10/01/08 | 260,910.82 | 925.30 |
| 10/01/08 | 11/03/08 | 259,985.52 | 925.30 |
| 11/03/08 | 12/01/08 | 259,060.22 | 925.30 |
| 12/01/08 | 01/02/09 | 258,134.92 | 925.30 |
| 01/02/09 | 02/02/09 | 257,209.62 | 925.30 |
| 02/02/09 | 03/02/09 | 256,284.32 | 997.63 |
| 03/02/09 | 04/01/09 | 255,286.69 | 997.63 |
| 04/01/09 | 05/01/09 | 254,289.06 | 997.63 |
| 05/01/09 | 06/01/09 | 253,291.43 | 997.63 |
| 06/01/09 | 07/01/09 | 252,293.80 | 997.63 |
| 07/01/09 | 08/03/09 | 251,296.17 | 997.63 |
| 08/03/09 | 09/01/09 | 250,298.54 | 997.63 |
| 09/01/09 | 10/01/09 | 249,300.91 | 997.63 |
| 10/01/09 | 11/02/09 | 248,303.28 | 997.63 |
| 11/02/09 | 12/01/09 | 247,305.65 | 997.63 |
| 12/01/09 | 01/04/10 | 246,308.02 | 997.63 |
| 01/04/10 | 02/01/10 | 245,310.39 | 997.63 |
| 02/01/10 | 03/01/10 | 244,312.76 | 1,063.23 |
| 03/01/10 | 04/01/10 | 243,249.53 | 1,063.23 |
| 04/01/10 | 05/03/10 | 242,186.30 | 1,063.23 |
| 05/03/10 | 06/01/10 | 241,123.07 | 1,063.23 |
| 06/01/10 | 07/01/10 | 240,059.84 | 1,063.23 |

| | | | |
|---|---|---|---|
| 07/01/10 | 08/02/10 | 238,996.61 | 1,063.23 |
| 08/02/10 | 09/01/10 | 237,933.38 | 1,063.23 |
| 09/01/10 | 10/01/10 | 236,870.15 | 1,063.23 |
| 10/01/10 | 11/01/10 | 235,806.92 | 1,063.23 |
| 11/01/10 | 12/01/10 | 234,743.69 | 1,063.23 |
| 12/01/10 | 01/03/11 | 233,680.46 | 1,063.23 |
| 01/03/11 | 02/01/11 | 232,617.23 | 1,063.23 |
| 02/01/11 | 03/01/11 | 231,554.00 | 1,153.05 |
| 03/01/11 | 04/01/11 | 230,400.95 | 1,153.05 |
| 04/01/11 | 05/02/11 | 229,247.90 | 1,153.05 |
| 05/02/11 | 06/01/11 | 228,094.85 | 1,153.05 |
| 06/01/11 | 07/01/11 | 226,941.80 | 1,153.05 |
| 07/01/11 | 08/01/11 | 225,788.75 | 1,153.05 |
| 08/01/11 | 09/01/11 | 224,635.70 | 1,153.05 |
| 09/01/11 | 10/03/11 | 223,482.65 | 1,153.05 |
| 10/03/11 | 11/01/11 | 222,329.60 | 1,153.05 |
| 11/01/11 | 12/01/11 | 221,176.55 | 1,153.05 |
| 12/01/11 | 01/03/12 | 220,023.50 | 1,153.05 |
| 01/03/12 | 02/01/12 | 218,870.45 | 218,870.45 |

# EXHIBIT E: January 19, 2006 Mortgage

LXSR Doc No: 00123512
Book: 7822 Page: 102

Recording Requested By:

BANK OF AMERICA, N.A.

When Recorded Mail To:
2970 Transit Road
NY7-505-01-24
West Seneca, NY 14224

**MORTGAGE DEED**

Atlantis Management, llc, a Rhode Island limited liability company with a principal place of business at 5 Princess Pine Road, Lincoln, RI 02865 (jointly and severally if more than one, the "Mortgagor"), for good and valuable consideration paid, does hereby GRANT, BARGAIN, SELL, CONVEY, TRANSFER, ASSIGN and SET OVER to Bank of America, N.A., a national banking association created and existing under the laws of the United States of America with its principal office located at 101 South Tryon Street, Charlotte, North Carolina 28255 ("Mortgagee"), WITH MORTGAGE COVENANTS, the land located in Providence, Rhode Island and more fully described on Exhibit A, together with all buildings and improvements now or hereafter located thereon (the "mortgaged premises").

TOGETHER WITH, and included as part of the mortgaged premises, all right, title and interest of the Mortgagor in and to the following property, rights and interests: (a) all easements, rights-of-way, streets, ways, alleys, passages, sewer rights, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the aforesaid real estate and all land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining said real estate to the center line thereof; (b) all machinery, apparatus, appliances, equipment, fittings, fixtures and other property of every kind and nature whatsoever owned by the Mortgagor, or in which the Mortgagor has or shall have an interest, now or hereafter affixed to the mortgaged premises, or located upon the mortgaged premises or appurtenant thereto and usable in connection with the present or future operation and occupancy of the mortgaged premises and all building equipment, materials and supplies of any nature whatsoever owned by the Mortgagor, or in which the Mortgagor has or shall have an interest, now or hereafter located upon the mortgaged premises, and together with any replacements therefor, additions thereto, and proceeds thereof; (c) all awards or payments, including interest thereon, and the right to receive the same, which may be made with respect to the mortgaged premises, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right), or for any other injury to or decrease in the value of the mortgaged premises; (d) all Leases and Rents (both as hereinafter defined) of the mortgaged premises, all as now existing or hereafter entered into or arising; (e) all other agreements (including without limitation all utility, management, or similar agreements) affecting the use or occupancy of the mortgaged premises now or hereafter entered into; (f) all proceeds of and any unearned premiums on any insurance policies covering the mortgaged premises, including without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the mortgaged premises; (g) all benefits of any deposit or payments heretofore or hereafter made relating to the mortgaged premises; and (h) the right, in the name and on behalf of the Mortgagor, to appear in and defend any action or proceeding with respect to the mortgaged premises and to commence any action or proceeding to protect the interest of the Mortgagee in the mortgaged premises.

Mortgagor hereby grants to the Mortgagee, as secured party, a security interest in all of the tangible and intangible personal property and fixtures of the Mortgagor associated with the mortgaged premises and agrees that the Mortgagee shall have with respect thereto (in addition to all other rights and remedies hereunder), all rights and remedies of a secured party under the Rhode Island Uniform Commercial Code. This Mortgage is intended to be effective as a financing statement filed as a Fixture Filing under the Rhode Island Uniform Commercial Code. Certain of the goods described herein are or are to become fixtures related to the mortgaged premises. The

record owner of the land is the Mortgagor.

TO HAVE AND TO HOLD the mortgaged premises and said Rents and Leases, together with all the rights, privileges and appurtenances thereunto belonging, unto and to the use of Mortgagee and its successors and assigns forever.

**Obligations Secured.** This Mortgage is granted to secure the following:

the performance and observance by Mortgagor of Mortgagor's obligations to the Mortgagee under the following instruments and any extensions, renewals, substitutions, modifications or replacements thereof (all collectively referred to as the "Debt Instruments"): All line of credit agreements, line of credit and term loan agreements, loan agreements, and accompanying promissory notes including that certain Note and Agreement of even date with this Mortgage in the maximum principal sum of $288,286.00, interest rate swap agreements, interest rate cap agreements, interest rate floor agreements, interest rate hedging agreements, or other similar agreements or arrangements related to the foregoing, and any agreements related to cash management services, and all obligations from time to time of the Mortgagor to the Mortgagee on account of (i) letters of credit issued by the Mortgagee for the account of the Mortgagor and (ii) bankers' acceptances.

the payment by Mortgagor to Mortgagee of all sums incurred, expended or advanced by Mortgagee pursuant to any provision of this Mortgage;

the payment, performance and observance by Mortgagor of each and every covenant, condition and obligation contained in this Mortgage or referred to herein, or incurred in connection herewith; and

the payment of all other indebtedness now or hereafter owing by Mortgagor to Mortgagee (other than indebtedness incurred primarily for personal, family or household purposes), evidenced by a promissory note or other similar agreements or arrangements related to the foregoing or agreement signed by Mortgagor, whether or not otherwise secured.

PROVIDED, NEVERTHELESS, that if Mortgagor, its heirs, personal representatives, successors or assigns, satisfies, pays and performs all of the Debt Instruments and other obligations secured hereby (including any notes or agreements evidencing future advances pursuant to paragraph 18 hereof), and any and all extensions, future amendments, modifications, renewals and replacements thereof, all of which are secured hereby, and until such time pays and performs all of Mortgagor's obligations, covenants and agreements set forth herein, then this Mortgage shall be null and void, otherwise it shall remain in full force and effect. It is an express condition of this Mortgage that it shall not be deemed satisfied or discharged until all terms and conditions set forth in the Debt Instruments have been met and until the Debt Instruments shall have been cancelled and terminated by the Mortgagee, with all terms and conditions thereof having been paid and satisfied in full, without any renewal or replacement being issued and notwithstanding that there may from time to time be zero balances outstanding under such Debt Instruments.

Mortgagor hereby represents and warrants that:

**Power and Authority.** Mortgagor has the requisite power and authority to own its properties and to carry on its business as now being conducted and as contemplated under this Mortgage and each Lease (as hereinafter defined) and to place mortgages and liens upon its assets; Mortgagor has full power and lawful authority to grant, sell and convey the mortgaged premises in the manner and form herein done.

**Compliance.** Mortgagor shall comply with all present and future applicable laws, ordinances, rules, regulations, directives and other requirements of all governmental instrumentalities, including without limitation those relating to Hazardous Substances, within such time periods as required thereby, with time being of the essence.

**Title.** Mortgagor has good and clear, record and marketable title in fee simple to the mortgaged premises subject only to the encumbrances set forth in Exhibit B attached hereto.

**Hazardous Substances.** Each reference in this Mortgage to "Hazardous Substances" shall be deemed to refer to any "chemical liquids," "hazardous material," "hazardous waste," "hazardous substances," "oil," "petroleum products," or "solid, liquid or gaseous products," as defined or referred to in or contemplated by any applicable federal, state, or local environmental law, statute, rule or regulation, and shall also include, without limitation, whether or not included in the definition contained in any such law, statute, rule or regulation, asbestos and other substances or materials which may pose a present or potential hazard to human health or the environment. Mortgagor has never released, generated, stored or disposed of any hazardous substances on the mortgaged premises in violation of any applicable environmental laws, and Mortgagor is not aware of the existence (except in full compliance with all applicable environmental laws), release or threat of release of any Hazardous Substances on or from the mortgaged premises or on or from any property adjacent to or surrounding the mortgaged premises, and for any breach of noncompliance by Mortgagor of its obligations under this Mortgage. The Mortgagor has not received any notice, order, claim or demand from the U.S. Environmental Protection Agency or any state or local

governmental agency, authority or body having jurisdiction over Hazardous Substances or the storage or removal thereof with respect to the existence, release or threat of release of any Hazardous Substances. Notwithstanding anything to the contrary in the Mortgage, Mortgagor shall not agree to a deed restriction or other encumbrance on the mortgaged premises relating to any Hazardous Substances without the prior written consent of the Mortgagee, which consent the Mortgagee may withhold in its sole discretion.

Mortgagor further covenants and agrees with Mortgagee as follows:

1. **Validity and Enforceability.** This Mortgage is and will remain a valid and enforceable lien on the mortgaged premises; Mortgagor will preserve such title, will forever warrant and defend the same to Mortgagee and will forever warrant and defend the validity and priority of the lien hereof against the claims of all persons whatsoever, except the holders of the encumbrances, if any, as set forth in Exhibit B.
2. **Repair.** Mortgagor shall at all times keep and maintain the mortgaged premises and each part thereof in sound condition and in a first-class state of decoration and repair.
3. **Compliance.** Mortgagor promptly shall comply with all present and future laws, ordinances, rules, regulations, directives and other requirements of all governmental instrumentalities.
4. **Restrictions.** Mortgagor shall comply with all restrictive covenants and other private restrictions, if any, applicable to the mortgaged premises.
5. **Hazardous Substances.** Mortgagor shall not release, generate, store (except in full compliance with all applicable environmental laws) or dispose of any Hazardous Substances on the mortgaged premises or on any property adjacent to or surrounding the mortgaged premises. In the event that (except in full compliance with all applicable environmental laws) any Hazardous Substances is found on or in the mortgaged premises, Mortgagor shall immediately contain and remove the same in compliance with all state and federal Hazardous Substances laws. The Mortgagor hereby authorizes the Mortgagee and its agents, representatives, appraisers, engineers and other designees, upon reasonable notice, to visit and enter upon the mortgaged premises for purpose of inspecting and/or appraising the same and/or performing environmental site assessments and evaluations. The Mortgagor agrees to pay all reasonable expenses and charges incurred by the Mortgagee in connection with such visits, inspections, appraisals, site assessments and evaluations. Mortgagor agrees to indemnify and hold Mortgagee harmless from and against any and all claims, liabilities, costs and expenses incurred by Mortgagee, including, without limitation, costs of litigation and reasonable attorney's fees, arising from the release, existence or removal of, any Hazardous Substances on or in the mortgaged premises or on any properties adjacent to or surrounding the mortgaged premises. THIS RIGHT OF INDEMNIFICATION SHALL SURVIVE THE PAYMENT IN FULL OF THE DEBT INSTRUMENTS, NOTWITHSTANDING ANY DISCHARGE OF THIS MORTGAGE.
6. **Sales and Transfers.** Mortgagor shall not, directly or indirectly, sell, convey, mortgage, pledge, hypothecate, encumber, lease, assign or otherwise transfer the mortgaged premises or any part thereof or any interest therein (including, without limitation, the transfer of any ownership interest in any Mortgagor that is not an individual) without the prior written consent of Mortgagee. Mortgagee's consent to any sale may be based on, among other things, its determination, in its sole and uncontrolled discretion, as to the acceptability of the terms of sale and as to the creditworthiness, financial strength and competence to manage the mortgaged premises of the proposed purchaser, and the entry into an assumption agreement by the proposed purchaser in form and substance satisfactory to Mortgagee, in its sole and uncontrolled discretion, which agreement may provide for, among other things, an increase in the interest rate applicable to the Debt Instruments and/or other change in the terms thereof. Without limiting the generality of the foregoing, Mortgagor will not create, join or consent to any condominium declaration, private restrictive covenant or other restriction affecting the mortgaged premises or any part thereof, without the prior written consent of Mortgagee.
7. **Easements; Licenses; Etc.** Mortgagor, to the extent reasonably within its control, shall maintain, preserve and renew (a) any and all easements, rights of way, privileges and hereditaments now or hereafter belonging or inuring to the benefit of the mortgaged premises and/or improvements or any part thereof, and (b) any and all licenses. Without the prior consent of Mortgagee, Mortgagor will not initiate, create, join in or consent to any change of zoning with respect to the mortgaged premises or any part thereof.
8. **Insurance.** Mortgagor shall keep all improvements situated on the mortgaged premises continuously insured against loss by fire and the risks covered under a so-called "extended coverage endorsement", flood, explosion of boilers, heating apparatus and other pressure vessels, and such other hazards, casualties and contingencies as Mortgagee from time to time reasonably may require, in an amount equal to one hundred percent (100%) of the replacement cost of such improvements. All such insurance shall be evidenced by valid and enforceable policies in form and substance satisfactory to Mortgagee. Without limiting the generality of the foregoing: (a) all such insurance policies shall contain an endorsement requiring twenty (20) days written notice to Mortgagee prior to

cancellation or change in the coverage, scope or amount of any such policy or policies; and (b) any and all policies evidencing casualty insurance shall provide that any and all loss shall be payable to Mortgagee notwithstanding any act or omission of Mortgagor which might otherwise result in cancellation or forfeiture of said insurance. Mortgagee shall have the right, and Mortgagee is hereby made, constituted and appointed (with full power of substitution and revocation) the true and lawful attorney-in-fact irrevocable of Mortgagor, in the name, place and stead of Mortgagor, but in the sole and uncontrolled discretion of said attorney, (i) to demand, adjust, sue for, compromise and collect any amounts due under such insurance policies in the event of loss; and (ii) to give releases for any and all amounts received in settlement of losses under such policy; and the same shall, at Mortgagee's option, be applied, after first deducting the cost of collection, to the payment of the indebtedness secured hereby, whether or not then due, or to reimbursement of any taxes, assessments, charges, insurance premiums or other obligations paid by Mortgagee pursuant hereto, or, notwithstanding the claims of any subsequent lienor, the same may be used to pay over to Mortgagor for use in repairing or replacing damaged buildings and improvements on the subject property. The Mortgagee, at its sole option, shall have the right to elect whether (i) to retain some or all of such insurance proceeds and apply the same to the Obligations evidenced by the Debt Instruments or (ii) to release some or all of such insurance proceeds to the Mortgagor for repair and restoration of the mortgaged premises. If Mortgagee shall by any manner acquire title to the mortgaged premises, it shall thereupon become the sole and absolute owner of all insurance policies held by or required hereunder to be delivered to Mortgagee, with the sole right to collect and retain all unearned premiums and dividends thereon, and Mortgagor shall only be entitled to a credit, in reduction of the then outstanding indebtedness secured hereby, in the amount of the short rate cancellation refund. Without limiting the generality of the foregoing, in the event of foreclosure of this Mortgage or any transfer of title to the mortgaged premises to a third-party purchaser pursuant to the power(s) in this Mortgage granted Mortgagee, Mortgagee shall be and is hereby authorized and empowered, for and in the name or names and on behalf of Mortgagor and/or Mortgagee, and for the purposes hereinafter set forth, shall be and is hereby made, constituted and appointed the true and lawful attorney-in-fact irrevocable of Mortgagor (with full power of substitution and revocation) in the name, place and stead of Mortgagor, and in the sole and uncontrolled discretion of said attorney, to surrender up the policies of insurance covering the mortgaged premises and any part thereof and to collect any amounts due thereunder or, at its option, to transfer all right, title and interest in and to said policies and the proceeds thereof to any purchaser of the mortgaged premises or any part thereof without obligation to account therefor to any person claiming title to the mortgaged premises; provided, however, that any amounts received by Mortgagee under said policies by way of refunds, dividends or otherwise, as aforesaid, shall be applied to the payment of Mortgagor's obligations under the Debt Instruments, and any surplus shall be paid over as a surplus on foreclosure. The foregoing appointments being coupled with an interest are irrevocable.

9. **Owner Occupancy.** Mortgagor shall occupy, or shall cause an affiliate of Mortgagor to occupy, the Mortgaged Property until all Obligations are paid in full.

10. **Taxes and Assessments.** Mortgagor shall pay, when due, all taxes, assessments, and other charges, fines and impositions attributable to the mortgaged premises (the "Impositions") and shall furnish to Mortgagee, promptly after payment of the same, certificates, receipts or other evidence reasonably satisfactory to Mortgagee of such payment; provided, however, Mortgagor shall not be required to pay and discharge any such imposition, if and so long as (a) the validity thereof shall be contested by Mortgagor with diligence and in good faith by appropriate proceedings and (b) Mortgagor shall have deposited with Mortgagee a sum equal to the amount being so contested and any additional charge, penalty or expense which may be incurred as a result of such contest; and provided further, however, that any such imposition and any such additional charge, penalty or expense shall be paid in full and before the mortgaged premises, or any part thereof, shall be seized and sold in satisfaction thereof. Mortgagor shall pay, when the same shall become due and payable, all claims and demands of mechanics, materialmen, laborers and others which, if unpaid, might result in or permit the creation of a lien on the mortgaged premises or any part thereof; provided, however, Mortgagor shall not be required to pay any such claim or demand, if and so long as (a) the validity thereof shall be contested by Mortgagor with diligence and in good faith by appropriate proceedings and (b) in the event that such claim or demand results in a lien or notice of record against the mortgaged premises or any part thereof, Mortgagor shall have bonded or otherwise caused such lien to be removed or discharged. Mortgagor shall pay to Mortgagee, within thirty (30) days after Mortgagee's demand, an amount equal to any and all taxes, assessments or charges of whatever nature (other than taxes on the net income of Mortgagee) which may at any time be assessed against Mortgagee with respect to the mortgaged premises or its ownership or holding thereof, whether under statutes now or hereafter in effect. In the event any such tax, assessment or charge is not or, under applicable law, cannot be so paid by Mortgagor, at the option of Mortgagee, the Mortgagor's obligations under the Debt Instruments shall become immediately due and payable.

11. **Tax and Insurance Payments.** Mortgagee, at any time, upon ten (10) days notice to Mortgagor, may require Mortgagor to pay to Mortgagee, on the first day of each calendar month, a sum equal to (a) one-twelfth (1/12) of the annual Impositions and (b) one-twelfth (1/12) of the annual premiums for the insurance required hereunder to be maintained on the mortgaged premises, the respective amounts of such Impositions and premiums to be reasonably estimated from time to time by Mortgagee (the "Deposited Funds"). Mortgagee shall apply the Deposited Funds to the payment of such Impositions and premiums and shall render an annual accounting to Mortgagor of all disbursements of the Deposited Funds. Although each such monthly payment of Deposited Fund is to be in a lump sum, each component thereof shall be deemed to be held separately by Mortgagor for, and shall be applied only to, the particular item for which payment was made by Mortgagor, unless Mortgagee, in its discretion, elects otherwise. If at any time Mortgagee estimates that there shall or will not be on deposit with it, at least one (1) month prior to the due date (a) of any item constituting part of the Impositions and/or (b) of any annual insurance premium, a sum sufficient for the payment of such item and/or premium in full, Mortgagor, upon demand, shall pay the amount of such deficiency to Mortgagee notwithstanding that there may already be deposited with Mortgagee sums for the payment of other items which are not yet due. If the amount of the Deposited Funds shall exceed the amount necessary to pay such Impositions and premiums for the then current year, such excess shall be credited against future monthly deposits required hereunder. Unless otherwise required by applicable law, no interest shall be paid on the Deposited Funds, and the Deposited Funds may be commingled with Mortgagee's general funds. Upon payment and other satisfaction in full of the obligations secured hereby, any excess Deposited Funds shall be refunded to Mortgagor. Upon the occurrence of any Event of Default, Mortgagee may apply against the obligations secured hereby, in such manner as Mortgagee may determine, any or all of the Deposited Funds then held by Mortgagee.

12. **Leases.** Mortgagor does hereby transfer, assign and deliver unto Mortgagee the Leases (which term shall be defined as each and every agreement providing for use or occupancy of all or any part of the mortgaged premises, whether written or oral, whether now existing or hereafter arising, and any and all amendments, renewals and extensions thereof), the Rents (which term shall be defined as any and all rents and other payments of every kind due or payable and to become due or payable to Mortgagor by virtue of the Leases, or otherwise due or payable and to become due or payable to Mortgagor as the result of any use, possession or occupancy of all or any part of the mortgaged premises) and all right, title and interest of Mortgagor in and to any and all guarantees of any of the Leases; TO HAVE AND TO HOLD the Leases, the Rents and any guarantees in connection therewith, together with all the rights, privileges and appurtenances now or hereafter in any wise belonging or pertaining thereto, unto Mortgagee, its successors and assigns, forever, subject, however, to the terms and conditions hereinafter provided in Paragraph 13.

13. **Right of Mortgagee to Collect Rents.** Mortgagor hereby authorizes and empowers Mortgagee to collect the Rents as the same shall become due, and hereby irrevocably directs each and all of the Lessees (which term shall be defined as any tenant pursuant to a Lease) and sublessees to pay to Mortgagee, upon demand by Mortgagee, the rents as may now be due or payable and/or shall hereafter become due or payable; provided however, no such demand shall be made by Mortgagee unless and until there shall have occurred a Default or an Event of Default as such terms or similar terms are used in the Debt Instruments. Until such demand is made, Mortgagor shall have the license to collect or continue to collect the Rents; upon such demand such license shall cease.
**Prepayment of Rents.** Mortgagor's right to collect or to continue to collect the Rents as aforesaid, shall not authorize collection by Mortgagor of any installment of rent or any other payment (exclusive of security deposits) more than one (1) month in advance of the respective dates prescribed in the Leases or otherwise for the payment thereof without the written consent of Mortgagee; and
**Lessee Protection.** No Lessee, sublessee, tenants or other occupant of the mortgaged premises making any payment to Mortgagee pursuant to this Paragraph 13 shall be under any obligation to inquire into or determine the actual existence of any default claimed by Mortgagee.

13.1 **Power of Attorney.** Mortgagee shall be and hereby is authorized and empowered, for and in the name or names and on behalf of Mortgagor and/or Mortgagee, and for the purposes hereinafter set forth, shall be and hereby is made, constituted and appointed the true and lawful attorney-in-fact of Mortgagor (with full power of substitution and revocation) and in the name, place and stead of Mortgagor, and in the sole and uncontrolled discretion of said attorney, to cause the assignment to Mortgagee of any Lease which has not been so assigned after request therefor by Mortgagee. The foregoing appointment, being coupled with an interest, is irrevocable until the obligations under the Debt Instruments are paid and otherwise satisfied in full.

13.2 **Approval.** Mortgagor shall not enter into any Lease without first obtaining Mortgagee's written approval of the terms and conditions thereof and the Lessee thereunder.

13.3 **Rent Roll.** Mortgagor shall, upon Mortgagee's request, supply Mortgagee within five (5) days of such request, a "rent roll," so-called, stating with respect to each unit in the mortgaged premises the name of the tenant thereof, the rent paid by such tenant, the date to which such rent is paid,

the date on which such tenant's leasehold interest terminates and the amount held by Mortgagor by way of security deposit from each such tenant; such rent rolls to be certified to as being accurate by Mortgagor.

13.4 **Remedies.** Mortgagee shall have the right forthwith, at its election, and without further notice or demand (except as otherwise specifically provided in this Mortgage or the other Debt Instruments) and without the commencement of any action to foreclose this Mortgage or the exercise of the power of sale Mortgagee has under this Mortgage, to enter immediately upon and take possession of the mortgaged premises, or any part thereof, without further consent or assignment by Mortgagor, and to do, execute and perform any act, deed, matter or thing whatsoever that ought to be done, executed and performed in and about or with respect to the mortgaged premises and the leasing, management, or operation thereof as fully as Mortgagor might do, including, without limitation, the right to institute summary proceedings against any Lessee who shall fail to comply with the provisions of the applicable Lease, with the right to lease the mortgaged premises, or any part thereof, and to collect and receive all of the Rents, issues and profits, and all other amounts past due or to become due to Mortgagor by reason of its ownership of the mortgaged premises and to apply the same, after the payment of all necessary charges and expenses in connection with the operation of the mortgaged premises (including, without limitation, any managing agent's commission, at the option of Mortgagee), on account of the obligations evidenced by the Debt Instruments. If Mortgagor or any other person claiming by, through or under it, (other than any Lessee whose tenancy Mortgagee has agreed in writing not to disturb or whose tenancy Mortgagee, in its sole and uncontrolled discretion, is willing not to disturb) are occupying all or any part of the mortgaged premises, it is hereby agreed that Mortgagor and such other persons shall either immediately surrender possession of the mortgaged premises to Mortgagee and vacate the premises so occupied or pay a reasonable rental for the use thereof, monthly in advance, to Mortgagee. Mortgagee shall also be entitled to have a receiver appointed to enter and take possession of the mortgaged premises, exercise the other rights and remedies available to the Mortgagee hereunder, collect the Rents and apply the same as the court may direct. Mortgagor also agrees that Mortgagee's legal remedies are inadequate and that Mortgagee shall be entitled to obtain equitable relief.

14. **Legal Action.** This Mortgage is upon the condition that all covenants of Mortgagor contained in this Mortgage and in the Debt Instruments shall be kept and performed, and for any breach of said condition, Mortgagee shall have the right to (i) institute and maintain an action of mortgage foreclosure against the mortgaged premises, through judicial proceedings pursuant to the applicable statutes, ordinances, or rules of civil procedure, or under any other legal method of foreclosure in existence at the time under any applicable law including, without limitation, the STATUTORY POWER OF SALE, which is expressly incorporated herein by reference, to the extent authorized or allowed by any present or future law of the State of Rhode Island and in connection therewith, (ii) institute and maintain an action on any note or other obligation secured hereby, (iii) sell or cause to be sold the mortgage premises or any portion thereof at public sale, and convey the same to the purchaser in accordance with said statutes in a single parcel or in several parcels at the option of the Mortgagee and foreclose this Mortgage, or (iv) take such other action at law or in equity for the enforcement of any document evidencing or securing the indebtedness secured hereby the law may allow. The Mortgagor stipulates that this Mortgage secures a loan or loans primarily for business and commercial purposes. No remedy herein conferred on the Mortgagee is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing. Mortgagor agrees for itself, its successors and assigns, that the acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of this Mortgage, of insurance proceeds, eminent domain awards, Rents or anything else of value to be applied on or to the obligations secured hereby by Mortgagee or any person or party holding under Mortgagee shall not constitute a waiver of such foreclosure. This agreement by Mortgagor is intended to apply to the acceptance and such application of any such proceeds, awards, Rents and other sums of anything else of value, whether the same shall be accepted from, or for the account of, Mortgagor or from any other source whatsoever by Mortgagee or by any person or party holding under Mortgagee at any time or times.

15. **Surrender of Possession.** In the event of any sale of the mortgaged premises under the provisions hereof, Mortgagor shall forthwith surrender possession thereof to the purchaser. Upon failure to do so, Mortgagor shall thereupon be a tenant at sufferance of such purchaser, and upon its failure to surrender possession of the mortgaged premises upon demand, such purchaser, his heirs, legal representatives, successors or assigns, shall be entitled to institute and maintain an appropriate action for possession of the mortgaged premises.

16. **Successors and Assigns.** This Mortgage shall be binding upon Mortgagor and the heirs, executors, administrators, successors and assigns of the Mortgagor and shall inure to the benefit of Mortgagee and successors and assigns of the Mortgagee, as if all such parties were all herein mentioned whenever the parties hereto are referred to. Wherever the words Mortgagor and Mortgagee are used

Doc No: 00123512
Book: 7822 Page: 108

herein they shall include their several successors, grantees and assigns, subject to the limitations of law and of this instrument.

17. **Effect of Conveyance.** In the event the ownership of the mortgaged premises, or any part thereof, becomes vested in a person or entity other than Mortgagor, Mortgagee may, without notice to Mortgagor, deal with such successor or successors in interest with reference to the mortgage and the debt hereby secured, in the same manner as with Mortgagor, without in any way vitiating or discharging Mortgagor's liability hereunder or upon the debt hereby secured. No sale of the premises hereby mortgaged and no forbearance on the part of Mortgagee and no extension of the time for the payment of the debt hereby secured given by Mortgagee shall operate to release, discharge, modify, change or affect the original liability of Mortgagor herein, either in whole or in part.
18. **Future Advances.** This Mortgage permits and secures any and all current and future advances to Mortgagor evidenced by such note or notes as may be signed by Mortgagor payable to Mortgagee and/or pursuant to such agreements as may be entered into by Mortgagor with Mortgagee.
19. **Descriptive Headings; Context.** The captions in this Mortgage are for convenience of reference only and shall not define or limit any provision. Whenever the context so requires, reference in this Mortgage to the neuter gender shall include the masculine and/or feminine gender, and the singular number shall include the plural, and, in each case, vice versa.
20. **Changes to Mortgage.** Mortgagor and Mortgagee may agree to change the interest rate and/or the maturity date of the Debt Instruments or other terms of this Mortgage or of the obligations secured by this Mortgage.
21. **Receipt of Mortgage.** Mortgagor hereby declares that the Mortgagor has read this Mortgage, has received a completely filled in copy of it, without charge therefor, and has signed this Mortgage as of the date shown below.
22. **Notice to Mortgagee.** All notices, requests, demands, consents or other communications given hereunder or in connection herewith (including any notice to Mortgagee pursuant to Rhode Island General Laws Sections 34-25-10(b) and 11 shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid to West Seneca – Credit Services, 2970 Transit Road, NY7-505-01-24, West Seneca, NY 14224.

IN WITNESS WHEREOF, Mortgagor has executed and delivered this Mortgage Deed under seal as of January 19, 2006.

WITNESS: [signature]

Atlantis Management, llc

By: [signature] Member
Tarek Wehbe, Member

STATE OF R.I.
COUNTY OF PROV.

On 1-19, 2006, then personally appeared before me, the above-named TAREK WEHBE the duly authorized MEMBER of ATLANTIS MANAGEMENT, LLC, and acknowledged the foregoing instrument to be his/her free act and deed in his/her said capacity and the free act and deed of ________.

[signature]
Notary Public
Print Notary Public's Name: THOMAS W. MACDONALD
My commission expires: 6-16-09

**EXHIBIT "A"**

That certain lot or parcel of land with all the buildings and improvements thereon situated in the City of Providence, County of Providence, State of Rhode Island, described as follows:

Doc No: 00123512
Book: 7722 Page: 109

Beginning at a point in the relocated westerly line of North Main Street at the northeast corner of the tract herein described, said point being in the southerly line of land of the City of Providence, fourteen and one hundredths (14.01) feet westerly as measured along the southerly line of said City of Providence land from the present westerly line of North Main Street;

Thence running S 22°-35'-13" W, bounded southeasterly by the relocated North Main Street, a distance of forty-seven and twenty hundredths (47.20) feet to a point of curvature;

Thence along the arc of a circle curving to the right having a radius of twenty (20.00) feet and a central angle of 73°-58'-19" bounded generally southeasterly on the relocated intersection of North Main Street and Livingston Street, a distance of twenty-five and eighty-two hundredths (25.82) feet to a point of tangency in the northerly line of Livingston Street;

Thence turning N 83°-26'-28" W, bounded southerly by Livingston Street, a distance of eighty-eight and fifty hundredths (88.50) feet to a point of curvature;

Thence along the arc of a circle curbing to the right having a radius of fifteen (15.00) feet and a central angle of 68°-36'-01" bounded generally southwesterly on the relocated intersection of Livingston Street and Mechanics Avenue, a distance of seventeen and ninety-six hundredths (17.96) feet to a point of tangency, in the easterly line of Mechanics Avenue;

Thence running N 14°-50'-27" W, bounded southwesterly by Mechanics Avenue, a distance of one hundred fifty-two and forty-five hundredths (152.45) feet to a corner;

Thence turning an interior angle of 76°-30'-54" and running N 88°-38'-39" E, bounded northerly by land now or formerly of the Providence Redevelopment Agency, a distance of sixty-one and six hundredths (61.06) feet to land of the City of Providence;

Thence turning an interior angle of 86°-33'-20" and running S 2°-05'-19" W, bounded easterly by land of the City of Providence a distance of seventy-eight and eighty-four hundred (78.84) feet to a corner;

Thence turning an interior angle of 255°-42'-20" and running S 73°-37'-01" E, bounded northeasterly by land of the City of Providence, a distance of one hundred twenty-five and fifty-six hundredths (125.56) feet to the point and place of beginning.

The first and last courses forming an interior angle of 83°-47'-46" and said parcel contains thirteen thousand eight hundred fourteen (13,814) square feet of land.

Subject to Restrictions in Book 1163, Page 1097 and in Book 1174, Page 1055 and in Book 3856, Page 125.

Subject to Easements in Book 1163, Page 1097 and in Book 1163, Page 1110 and in Book 1174, Page 1055.

**Property Address:**
**790 North Main Street**
**Providence, Rhode Island**
**AP #74, Lot #118**

RECEIVED:

Providence
Received for Record
Jan 19,2006 at 11:35:56A
Document Num: 00123512
Barbara Troncy
Recorder of Deeds